Filed 3/7/24

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| V LIONS FARMING, LLC, et al., | F084763, F085102, F085220 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. Nos. BCV-15-101645, BCV-15-101666, BCV-15-101679, BCV-21-100533, BCV-21-100536) |
| COUNTY OF KERN et al., | |
| Defendants and Respondents; | **OPINION** |
| CALIFORNIA INDEPENDENT PETROLEUM ASSOCIATION et al., | |
| Real Parties in Interest and Respondents. | |

APPEAL from a judgment of the Superior Court of Kern County. Gregory A. Pulskamp, Judge.

Shute, Mihaly & Weinberger, Rachel B. Hooper, Susannah T. French, Kevin P. Bundy, Tori B. Gibbons, and Daniel P. Selmi for Plaintiff and Appellant V Lions Farming.

Earthjustice, Colin C. O'Brien and Gregory D. Muren for Plaintiffs and Appellants Natural Resources Defense Council and Sierra Club.

---

[*]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the Facts, Proceedings, and parts I., III., IV., V., VI., VII., and V.III. of the Discussion.

Center on Race, Poverty & The Environment, Caroline Farrell and Daniel I. Ress for Plaintiffs and Appellants Committee for a Better Arvin, Committee for a Better Shafter, and Comité Progreso de Lamont.

Natural Resources Defense Council and Ann Alexander for Plaintiff and Appellant Natural Resources Defense Council.

Center for Biological Diversity and Hollin K. Kretzmann for Plaintiff and Appellant Center for Biological Diversity.

Margo A. Raison, County Counsel, Andrew C. Thomson, Deputy County Counsel; Holland & Knight, Jennifer L. Hernandez, Bradley B. Brownlow, Marne S. Sussman, Daniel R. Golub and Emily M. Lieban for Defendants and Respondents.

Pillsbury Winthrop Shaw Pittman, Blaine I. Green, Mark E. Elliott, and Eric Moorman for Real Party in Interest and Respondent Western States Petroleum Association.

Manatt, Phelps & Phillips, Craig A. Moyer, Benjamin G. Shatz and Sigrid R. Waggner for Real Party in Interest and Respondent California Independent Petroleum Association.

Environmental Law Clinic and Deborah A. Sivas for California Council of Land Trusts as Amici Curiae on behalf of Appellants.

Environmental Law Clinic, Deborah A. Sivas and Rica Garcia for David J.X. González, Ph.D., Rachel Morello-Frosch, Ph.D., Jill Johnston, Ph.D., Mary Willis, Ph.D., Jonathan Buonocore, Ph.D., Joan A. Casey, Ph.D., and Lisa Mckenzie, Ph.D. as Amici Curiae on behalf of Appellants.

Frank G. Wells Environmental Law Clinic, Andria So, Cara Horowitz and Gabriel F. Greif for H. Bradley Shaffer as Amici Curiae on behalf of Appellants.

-ooOoo-

This is the second appeal addressing whether the County of Kern[1] complied with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)[2] in approving an ordinance streamlining the permitting process for new oil and gas wells. (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814 (*King & Gardiner*).) In the first appeal, we determined the environmental impact report (EIR) was defective and ordered the issuance of a writ of mandate directing the County to correct those defects before reapproving the ordinance. (*Id*. at p. 901.) The County prepared a revised supplemental recirculated environmental impact report (SREIR) and an addendum, certified the completion of the SREIR, and adopted a slightly modified ordinance. After the County filed a return, the superior court determined the CEQA violations had been corrected and discharged the writ. This appeal followed.

In the published part of this opinion, we consider whether an agricultural conservation easement (ACE) partially mitigates a conversion of agricultural land caused by the project. In *King & Gardiner*, *supra*, 45 Cal.App.5th 814, we decided a narrow aspect of the efficacy of ACE's as mitigation by concluding ACE's were not effective at reducing the project's conversion of agricultural land *to a less than significant level* for purposes of CEQA. Here, we address the broader issue of whether ACE's qualify as *compensatory* mitigation for purposes of California Code of Regulations, title 14, section 15370, subdivision (e) (hereafter "Guidelines"),[3] which defines mitigation to include "[c]ompensating for the impact by … providing substitute resources." (Guidelines, § 15370, subd. (e).) To promote CEQA's purpose of long term protection of the environment, we join the First District in interpreting the phrase "providing substitute

---

[1]  In this opinion, "County" refers to the governmental entity and "Kern County" refers to the geographical area.

[2]  All unlabeled statutory references are to the Public Resources Code.

[3]  "Guidelines" hereafter refers to the regulations that implement CEQA and are codified in California Code of Regulations, title 14, section 15000 et seq.

resources" to encompass preserving existing agricultural land.  (*Masonite Corp. v. County of Mendocino* (2013) 218 Cal.App.4th 230, 238 (*Masonite*).)  Thus, ACE's qualify as compensatory mitigation, even though they do not replace or otherwise offset the acres of agricultural land converted by the project—that is, they do not ensure the project results in no net loss of agricultural land.  (*Ibid.*; see *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers* (11th Cir. 2016) 833 F.3d 1274, 1281 [under federal law, one of four methods of compensatory mitigation is the preservation of an existing aquatic site]; 40 C.F.R. § 230.92 [definitions of compensatory mitigation and preservation].)

In the unpublished part of this opinion, we address whether the SREIR's discussion of the cancer risk associated with the drilling of more than one well near a sensitive receptor complied with CEQA.  We conclude that discussion is inadequate for purposes of CEQA because it lacks sufficient information for the public and decision makers to meaningfully understand the cancer risk resulting from multiple wells drilled outside the 210-foot setback distance specified in the ordinance.  The health risk assessment for the drilling of multiple wells used a setback distance of just under 1,000 feet instead of analyzing reasonably foreseeable situations that could arise under the ordinance's actual setback distances.  This informational defect must be corrected before the ordinance is reapproved.

We also address whether the County misconstrued CEQA when it decided to remove a water supply mitigation measure because "there is no requirement in CEQA to perform an analysis or provide mitigation for impacts to low-income or disadvantaged communities."  While social and economic effects are not themselves environmental impacts, social and economic effects are relevant in determining the *significance* of a physical change to the conditions constituting the environment.  (Guidelines, § 15064, subd. (e).)  Here, the County's erroneous view of CEQA's principles addressing social and economic effects tainted its analysis of (1) the significance of lowering groundwater

levels in wells and (2) appropriate mitigation for reducing the significance of the project's contribution to that cumulative impact.

We also conclude appellants have not carried their burden of establishing prejudicial error involving (1) the air quality mitigation measures addressing emissions of particulate matter, (2) the analysis of impacts to the Temblor legless lizard, or (3) the absence of Spanish language translations of certain notices and portions of the SREIR.

We therefore reverse the judgment and discharge order and remand for further proceedings.

## THE PARTIES

Appellant V Lions Farming, LLC (Lions Farming) was named King and Gardiner Farms, LLC before it amended its articles of organization in February 2021. The other appellants are Natural Resources Defense Council, Sierra Club, Committee For A Better Arvin, Committee For A Better Shafter, Comite Progreso de Lamont, and Center for Biological Diversity (collectively, Sierra Club).

The respondents are the County, the Board, and real parties in interest Western States Petroleum Association and California Independent Petroleum Association. They filed a joint respondents' brief to Lions Farming's opening brief, a joint respondent's brief to Sierra Club's opening brief, and are referred to collectively as the County.

## FACTS[*]

### *The Project*

The proposed project is an amendment of Title 19 of the Kern County Zoning Ordinance that focuses on Chapter 19.98, which contains procedures and standards applicable to the exploration, drilling and production of oil and gas. The amendment is designed to streamline the process for obtaining permits for local oil and gas activities, such as drilling new wells.

---

[*]     See footnote, *ante*, page 1.

5.

The previous amendment streamlining the procedures in the zoning ordinance is described in *King & Gardiner*, *supra*, 45 Cal.App.5th 814, and was effective from December 9, 2015 through March 25, 2020. While it was in effect, 5,861 permits subject to "Oil and Gas Conformity Review" were issued and 622 permits subject to "Minor Activity Review" were issued.

The environmental review conducted for that amendment began in 2013 and ended with the Board's November 9, 2015 approval of the project, which included adopting the amendment as set forth in ordinance No. G-8605 (Ordinance). (*King & Gardiner*, *supra*, 45 Cal.App.5th at pp. 834–835.) The Board also certified the 2015 EIR as complete and adopted (1) findings of fact to support its determinations relating to significant environmental impacts; (2) a statement of overriding considerations; and (3) a proposed mitigation measure monitoring program. (*Id*. at p. 835.)

*Project Area, Subareas and Tiers*

The project area contains 3,700 of Kern County's 8,202 square miles. It includes most of the San Joaquin Valley Floor located in Kern County. The SREIR divides the project area into three subareas (western, central and eastern) and used those subareas in its analysis of many of the project's environmental impacts. (See *King & Gardiner*, *supra*, 45 Cal.App.5th at pp. 832–833.)

In addition, a system of five tiers based on land use was adopted to classify the land within the project area and subareas. Tier 1 land is where oil and gas activities are the primary land use and the existing well and activity densities preclude almost all other uses. Tier 2 land has agriculture as the primary land use. Tier 3 land is zoned for light, medium or heavy industrial, natural resource, recreation forestry, floodplain, and a few other uses. Tier 4 land is zoned for residential and commercial use and oil and gas activities require a conditional use permit. Tier 5 land has specific plan boundaries either adopted with a special planning district or which include specific provisions for oil and gas operations.

6.

*Prior Appeal*

In December 2015, Lions Farming and Sierra Club filed petitions for writ of mandate and complaints. (*King & Gardiner*, *supra*, 45 Cal.App.5th at pp. 835–836.) The superior court consolidated the matters based on the parties' stipulation. (*Id*. at p. 836.) The trial court issued its ruling on the CEQA issues in March 2018, finding a couple of CEQA violations and denying the others. (*King & Gardiner, supra,* at p. 836.) In April 2018, the court entered a final judgment. (*Ibid*.) Lions Farming and Sierra Club appealed. (*Id*. at p. 837.) In February 2020, we affirmed the judgment in part and reversed it in part. (*Id*. at p. 901.) We directed the superior court enter a modified judgment and issue a second peremptory writ of mandate directing the County to set aside its approval of the 2015 ordinance. (*Ibid*.) We also stated the writ should direct the County, in the event it decided to present the Ordinance for reapproval, to prepare a revised EIR "correcting the CEQA violations relating to (a) water supply impacts and mitigation measures, (b) PM2.5 emission impacts and mitigation measures, (c) agricultural land impacts and mitigation measures, and (d) the analysis of noise impacts." (*Ibid*.)

*Proceedings on Remand*

In April 2020, the County issued an "INITIAL STUDY/NOTICE OF PREPARATION" for a slightly revised ordinance. The notice stated that the SREIR, including the "Multi-Well Health Risk Assessment,"[4] would be recirculated for public

---

*    See footnote, *ante*, page 1.

[4]    In the previous appeal, we agreed with the County's statement that the assessment titled "Cumulative Health Risk Assessment" was not a "cumulative impact" analysis as that term is used in CEQA because the assessment did not address the "cumulative impact from several projects" on human health risk in the project area. (Guidelines, § 15355, subd. (b) [definition of "[c]umulative impacts"].) As a result, we referred to, and continue to refer to, the document as the "Multi-Well Health Risk Assessment."

review and comment and the County would prepare and publish responses to the comments. The proposed revised ordinance limited the number of new well permits to 2,697 per year, instead of 3,746. (See *King & Gardiner*, *supra*, 45 Cal.App.5th at p. 832 [2015 EIR forecast 2,697 new wells would be drilled each year].) In May 2020, the County held a virtual scoping meeting and solicited written and oral responses to the notice of preparation. At that meeting, Spanish translation services were provided.

On June 12, 2020, the superior court (1) filed an order vacating portions of, and modifying its order dated March 12, 2018, and (2) issued the first modified judgment. On June 17, 2020, the court issued a second peremptory writ of mandate (Second Writ) directing the Board to set aside its certification of the EIR, its findings of fact and statement of overriding considerations, and its approval of the Ordinance. The Second Writ stated the County "must refrain from reviewing and approving permits pursuant to the Ordinance until and unless the Ordinance is readopted in compliance with CEQA and this writ." It also identified the CEQA violations that needed to be corrected before the Ordinance, or a modified version, could be readopted.

On August 3, 2020, the County released a draft SREIR. Two weeks later, the County's department of planning and natural resources hosted a virtual public briefing workshop to provide an overview of the draft SREIR and an opportunity for public comments. At the end of August, the County filed an initial return to the Second Writ stating the County's approvals relating to the Ordinance had been set aside and the issuance of permits had ceased as of the close of business on March 26, 2020. The initial return also described the actions relating to the draft SREIR. The 45-day review period for public comments on the draft SREIR ended on September 16, 2020.

On October 30, 2020, the County released a revised draft SREIR. In January 2021, the County released the final SREIR, which included responses to the public comments received. The comments and response relevant to the issues raised in this

8.

appeal are described later in this opinion. In February 2021, the County release its proposed findings of fact and statement of overriding considerations.

*Approval of Revised Ordinance*

On March 8, 2021, the Board held a special meeting and unanimously adopted Ordinance No. G-8992 (Revised Ordinance), which amended title 19 of the County's Ordinance Code. The Board's resolution found that certain environmental impacts could not be mitigated, adopted a statement of overriding considerations, and found the final SREIR was complete and complied with CEQA.

*Challenges to Revised Ordinance*

On March 10, 2021, Lions Farming and Sierra Club filed separate petitions for writ of mandate and complaints for injunctive relief challenging the County's adoption of the Revised Ordinance, certification of the completion of the SREIR, and adoption of the statement of overriding considerations. They requested the issuance of a writ of mandate directing the County to vacate those decisions.

On April 6, 2021, the County filed a final return to the Second Writ stating it had complied with the terms of the writ and adopted the Revised Ordinance in compliance with CEQA and the writ. Three days later, Lions Farming and Sierra Club filed a joint objection to the County's final return to the Second Writ. The joint objection referred to the CEQA violations set forth in the writ petitions and complaints they filed a month earlier.

*The County Begins Issuing Permits*

In August 2021, Lions Farming and Sierra Club filed a joint motion to enforce the Second Writ along with supporting papers. The joint motion asserted the County had begun to review and issue permits under the Revised Ordinance in direct violation of the Second Writ. The superior court heard the motion in September 2021, after the County filed an opposition and Lions Farming and Sierra Club filed a reply.

9.

In October 2021, the superior court issued a written ruling granting in part the joint motion to enforce the Second Writ. The court determined it, rather than the County, should determine whether the Second Writ had been satisfied and directed the County to immediately suspend operation of the Revised Ordinance and cease the review and issuance of permits. The court did not retroactively invalidate the permits the County had issued before its order.

*Ruling on the Petitions for a Third Writ*

On June 7, 2022, the superior court issued a ruling on the petitions of Lions Farming and Sierra Club had filed in March 2021 to challenge the final SREIR and the County's approval of the Revised Ordinance. The court granted the petitions in part and denied them in part, finding four CEQA violations. The court determined (1) a mitigation measure of emission for particulate matter of 2.5 microns or less in diameter (PM2.5)[5] was not enforceable; (2) the SREIR did not adequately analyze water supply impacts; (3) the elimination of a measure involving the removal of legacy equipment to mitigate the project's conversion of agricultural land was not adequately addressed; and (4) the foregoing violations required the invalidation of the statement of overriding considerations.

The superior court rejected other claims by determining (1) the County was not required to adopt ACE's as a mitigation measure for the conversion of agricultural land because the 2020 opinion ruled ACE's do not provide effective mitigation for such conversions; (2) the health risk assessment addressing the risk of cancer from drilling multiple wells near a sensitive receptor, such as a residence or school, was legally adequate; (3) information in a 2019 study of the Temblor legless lizard was not "new information" or "changed circumstances" for purposes of Guidelines section 15162 and,

---

**5**     (40 C.F.R. § 50.7(a) [definition of PM2.5]; Cal. Code Regs., tit. 17, § 70100, subd. (j) [definition of fine suspended particulate matter].)

therefore, further analysis of impacts to that species was not required; and (4) res judicata barred Sierra Club's challenge to the County's decision not to translate notices and parts of the SREIR into Spanish. Each of these four determinations are among those challenged in this appeal.

The June 7, 2022 trial court ruling did not identify the relief that would be granted for the CEQA violations. Instead, it directed the parties to meet and confer on the issue before a case management conference addressing remedies. The parties did not agree on the appropriate remedies, but did agree to a briefing schedule and a September 2022 hearing date.

*Judgment and Third Writ*

On October 4, 2022, the superior court issued a ruling on the remedies and relief for the CEQA violations previously identified. The court concluded it was not necessary to vacate the project approval or vacate the certification of the SREIR as complete. It also extended the full suspension of project activities that had been entered earlier. The same day, the court issued a "SECOND MODIFIED JUDGMENT" and a "THIRD PEREMPTORY WRIT OF MANDATE" (Third Writ). The second modified judgment stated the petitions for writ of mandate were granted in part and denied in part, set forth the terms to be included in the Third Writ, and stated a full suspension of project activities pending corrective action was sufficient to achieve compliance with CEQA and protect the environment.

The Third Writ stated it replaced and superseded the Second Writ and directed the County to address the four discrete CEQA violations identified in the June 7, 2022 ruling and to file a return within 90 days setting forth how those violations had been addressed.

About a week later, the County filed a return to the Third Writ and requested the writ be discharged. The County's papers included a copy of the resolutions adopted by the Board on August 23, 2022. One resolution included the Board's approval of the SREIR, a proposed addendum, revised and restated findings of fact, and a restated

11.

statement of overriding considerations. Another resolution approved a program called the "VOLUNTARY DISADVANTAGED COMMUNITY DRINKING WATER GRANT FUND PILOT PROGRAM" to which permit applicants could make voluntary, nonrefundable contributions. That resolution stated that, before permitting had been halted, permit applicants had contributed over $180,000 for use by the County public health department in water challenged communities.

On November 2, 2022, the superior court discharged the Third Writ in an order finding the County had complied with the writ in all respects. The order also lifted the suspension of the operation of the Revised Ordinance.

*Notices of Appeal*

Lions Farming and Sierra Club filed separate notices of appeal from (1) the superior court's June 7, 2022 ruling on the merits of their petitions for a third writ of mandate; (2) the October 4, 2022 second modified judgment and the related ruling on remedies and relief; and (3) the November 2, 2022 order discharging the Third Writ. In December 2022, after appellants' motion to consolidate went unopposed, the three appeals were consolidated by this court under case No. F084763.

*Stay Granted*

In December 2022, Lions Farming and Sierra Club jointly filed a petition for writ of supersedeas and a request for stay to prevent the continuing issuance of permits under the Revised Ordinance. On January 26, 2023, after respondents filed an opposition to the petition and appellants filed a reply, this court granted a stay of the superior court's November 2, 2022 discharge order. As a result of the stay, the previously ordered suspension of the operation of the Revised Ordinance remained in full force and effect.

*Further Briefing*

In June 2023, after appellants' reply briefs were filed, H. Bradley Shaffer, Ph.D., applied for leave to file an amicus curiae brief in support of appellants on issues related to the Temblor legless lizard. In July 2023, David J.X., Gonzalez, Ph.D., four other

12.

professors, and an environmental epidemiologist applied for leave to file an amicus curiae brief in support of appellants on issues involving cancer risk and the Multi-Well Health Risk Assessment. Also, that July, the California Council of Land Trust applied for leave to file an amicus curiae brief in support of appellants on issues related to agricultural conservation easements.

This court granted the applications and authorized the County to file a consolidated answer to the three briefs. The order also directed the answer to address three questions relating to the project's conversion of agricultural land and allowed the answer to "include an interpretation of the text of subdivision (e) of Guidelines section 15370 (as amended in 2018) and an application of that interpretation to the facts of this case. (See 1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2023) § 13.72, pp. 13-100 to 13-102 [discussing relationship of *King & Gardiner* … to 2018 version of Guidelines § 15370, subd. (e)].)"

In August 2023, this court granted Lions Farming's application to file a reply to the consolidated answer. Subsequently, this court issued an order giving the County an opportunity to address specific issues relating to the interpretation of the discussion and conclusions relating to agricultural conservation easements in our 2020 opinion. (See *King & Gardiner*, *supra*, 45 Cal.App.5th at pp. 872–876, 878–879 [pts. VI.C.1. & VI.C.5.].) The County elected to file a supplemental brief.

## DISCUSSION

I.     STANDARD OF REVIEW[*]

Section 21168.5 provides that in any action or proceeding addressing noncompliance with CEQA, the judicial "inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not

---

[*]     See footnote, *ante*, page 1.

13.

supported by substantial evidence." (§ 21168.5.) Based on this provision and established case law, the parties agree that the abuse of discretion standard of judicial review applies in this appeal. (See *Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512 ["standard of review in a CEQA case … is abuse of discretion"].) When reviewing an agency's decision, courts must follow the "principle that there is no presumption that error is prejudicial." (§ 21005, subd. (b).)

Under CEQA, an abuse of an agency's discretion usually occurs in one of two ways. (*King & Gardiner, supra,* 45 Cal.App.5th at p. 837.) First, the "agency could fail to proceed in the manner required by CEQA, thereby committing procedural (i.e., legal) error." (*Id*. at pp. 837–838.) "Whether the public agency has employed the correct procedures—that is, followed applicable law—is subject to independent judicial review." (*Id*. at p. 838.) Examples of whether an agency followed applicable procedures include whether the agency provided sufficient notice and opportunity to comment on a draft EIR and whether the agency omitted the required discussion of alternatives. (*Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th at p. 512.)

Second, an agency could abuse its discretion by making findings of fact that are not supported by sufficient evidence. (*King & Gardiner*, *supra*, 45 Cal.App.5th at p. 838.) The agency's findings of fact are subject to the deferential substantial evidence standard of review. (*Ibid*.) Substantial evidence includes "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts" and excludes argument, speculation, and unsubstantiated opinion. (§ 21082.2, subd. (c); Guidelines, § 15384.)

Sometimes, the inquiry into CEQA compliance does not fall neatly into one of these two categories and, instead, "[t]he inquiry presents a mixed question of law and fact." (*Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th at p. 516.) Generally, courts conduct an independent review of mixed questions while applying the substantial evidence standard to an agency's underlying findings of fact. (*Ibid*.) However, when "factual questions predominate, a more deferential standard is warranted." (*Ibid*.) For

example, an agency's choice of methodology for analyzing a potentially significant environmental effect is subject to review under the substantial evidence standard. (*Id.* at pp. 514, 516.)

## II.     AGRICULTURAL CONSERVATION EASEMENTS

The parties dispute whether ACE's qualify as a type of mitigation for the project's conversion of agricultural land. CEQA defines " '[a]gricultural land' " as "prime farmland, farmland of statewide importance, or unique farmland, as defined by the United States Department of Agriculture land inventory and monitoring criteria, as modified for California." (§ 21060.1, subd. (a).) This opinion adopts this definition and uses the terms "agricultural land" and "farmland" interchangeably.

To summarize the discussion that follows, in *King & Gardiner*, *supra*, 45 Cal.App.5th 814, we decided a narrow aspect of the efficacy of ACE's as mitigation, addressing only whether ACE's were "effective" at reducing the project's conversion of agricultural land *to a less than significant level for purposes of CEQA*. We concluded ACE's were not "effective" at accomplishing that specific task.

Here, we address the broader question whether ACE's are effective at providing *any type of mitigation for purposes of CEQA*. The Guidelines define " '[m]itigation' " by giving five examples, including "[c]ompensating for the impact by … providing substitute resources." (Guidelines, § 15370, subd. (e).) We conclude this text is ambiguous and, therefore, resolve the ambiguity by adopting the interpretation that best effectuates CEQA's purpose of the long term protection of the environment. The long term protection of the environment is best promoted by accepting, rather than rejecting, ACE's as a type of compensatory mitigation. Consequently, we join the First District in concluding "ACEs compensate for the loss of farmland within the Guidelines definition of mitigation" by "preserving substitute resources," even though ACE's do not ensure the project causes no net loss of farmland. (*Masonite*, *supra*, 218 Cal.App.4th at p. 238.)

15.

A.    Background

*1.    Conservation Easements*

The term "conservation easement" is statutorily defined as a limitation in the form of an easement, restriction, covenant, or condition in an instrument executed by or on behalf of the landowner; it is binding on successive owners; and its purpose is "to retain land predominantly in its natural, scenic, historical, agricultural, forested, or open-space condition." (Civ. Code, § 815.1.)  A conservation easement "shall be perpetual in duration," "shall constitute an interest in real property," and its characteristics shall be those specified in the written instrument.  (Civ. Code, § 815.2, subds. (b), (c), (d).)  A conservation easement may be acquired and held by certain nonprofit organizations, state or local government entities including a county or city, and certain Native American tribes.  (Civ. Code, § 815.3.)  Other aspects of conservation easements, including recordation and enforcement, are addressed in Civil Code sections 815.4 through 815.10.

The more specific term "agricultural conservation easement" is defined as "an interest in land, less than fee simple, that represents the right to prevent the development or improvement of the land, as specified in Section 815.1 of the Civil Code, for any primary purpose other than agricultural production.  The easement shall be granted for the California Farmland Conservancy Program by the owner of a fee simple interest in land to any of the organizations or entities specified in Section 815.3 of the Civil Code.  It shall be granted in perpetuity as the equivalent of covenants running with the land." (§ 10211; see § 10230.2 [California Farmland Conservancy Program].)

*2.    Interpreting Appellate Opinions*

Our 2020 opinion discussed ACE's as a mitigation measure for the project's conversion of agricultural land to another use.  The parties disagree on how to interpret that discussion and the resulting conclusions.  (See *King & Gardiner*, *supra*, 45 Cal.App.5th at pp. 872–876 [pt. VI.C.1.].)  Accordingly, we set forth the principles that govern the interpretation of appellate opinions.

16.

Other CEQA decisions have addressed a disagreement among the parties about the meaning or effect of an opinion published in an earlier appeal.  (E.g., *POET, LLC v. State Air Resources Bd.* (2017) 12 Cal.App.5th 52, 63 (*Poet II*); *Protect Our Water v. County of Merced* (2005) 130 Cal.App.4th 488, 494 [issue of who was the prevailing party turned on the import of this court's earlier opinion]; *San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (2001) 89 Cal.App.4th 1097, 1101–1102 [respondents' narrow interpretation of prior opinion rejected].)  In *Poet II*, we addressed how *POET, LLC v. State Air Resources Bd.* (2013) 218 Cal.App.4th 681 should be interpreted.  (*Poet II*, *supra*, 12 Cal.App.5th at p. 63.)  We concluded (1) the interpretation of the earlier opinion presented a question of law and (2) that question was subject to our independent review.  (*Ibid.*; see *Ayyad v. Sprint Spectrum, L.P.* (2012) 210 Cal.App.4th 851, 859 [interpretation of an appellate opinion is a legal issue subject to de novo review].)

In accordance with *Poet II*, we again conclude the interpretation of our prior opinion presents a question of law subject to our independent review.  We make this opinion more explicit than *Poet II* or *San Bernardino Valley Audubon Society v. Metropolitan Water Dist., supra*, 89 Cal.App.4th 1097, by noting that the "interpretation of an appellate opinion is governed by the rules of construction that apply to any other writing."  (16 Cal.Jur.3d (2020) Courts, § 331, p. 925.)  Under those rules, an opinion must receive an objectively reasonable interpretation—that is, (1) it must be read as whole, (2) its language must be viewed in light of the facts and the issues before the court, and (3) each statement must be considered in its proper context.  (*Ibid.*; *Kirk v. First American Title Ins. Co.* (2010) 183 Cal.App.4th 776, 797.)  The scope of the "[l]anguage used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered."  (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2; *Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1252 [cases are not authority for propositions not considered];

17.

see 9 Witkin, Cal. Procedure (6th ed. 2021) Appeal, § 530, pp. 563–564 [*ratio decidendi* and *dicta*].)

The first step in analyzing the meaning of a writing is determining whether the language is ambiguous. (*In re Estate of Russell* (1968) 69 Cal.2d 200, 208–209 [initial determination is whether the terms of any written instrument are free from ambiguity]; see *Joseph v. City of Atwater* (2022) 74 Cal.App.5th 974, 982 [ambiguity is the threshold question in contract interpretation]; *Gutierrez v. Carmax Auto Superstores California* (2018) 19 Cal.App.5th 1234, 1249 [whether a statute's language is ambiguous is the first question of statutory interpretation].) "Ambiguous" means susceptible to more than one reasonable interpretation. (*Gutierrez*, *supra*, at p. 1249; *Estate of Newmark* (1977) 67 Cal.App.3d 350, 355 ["ambiguity exists in a written instrument when its language is properly susceptible to multiple constructions"].)

B.   The 2020 Opinion

1.   *Effective Mitigation*

In *King & Gardiner*, *supra*, 45 Cal.App.5th 814, Lions Farming raised several issues related to the project's conversion of agricultural land. (*Id*. at p. 872 [Part VI.B., Contentions of the Parties].) The issue relevant to this appeal arose from Lions Farming's contention that the mitigation measure for the conversion of agricultural land, mitigation measure (MM) 4.2-1, "does not support the Board's finding that conversions of agricultural land would be reduced to a less than significant level." (*Ibid*.) To resolve this alleged CEQA violation, we evaluated "the effectiveness of each" of the four mitigation options contained in MM 4.2-1. (*King & Gardiner, supra,* at p. 872.)

The first mitigation option, MM 4.2-1.a, authorized the use of ACE's. (*King & Gardiner*, *supra*, 45 Cal.App.5th at p. 872.) We analyzed the characteristic of ACE's and concluded "that MM 4.2-1.a does not provide *effective mitigation* for the conversion of agricultural land." (*Id.* at p. 876, italics added.) How to interpret this conclusion is at the

18.

heart of the parties' dispute over ACE's. The discussion immediately preceding the conclusion stated:

> "Entering into a binding agricultural conservation easement does not create new agricultural land to replace the agricultural land being converted to other uses. Instead, an agricultural conservation easement merely prevents the future conversion of the agricultural land subject to the easement. Because the easement does not offset the loss of agricultural land (in whole or in part), the easement does not reduce a project's impact on agricultural land. The absence of any offset means a project's significant impact on agricultural land would remain significant after the implementation of the agricultural conservation easement. Restating this conclusion using the data from this case, the implementation of agricultural conservation easements for the 2[98] acres of agricultural land estimated to be converted each year would not change the net effect of the annual conversions. At the end of each year, there would be 2[98] fewer acres of agricultural land in Kern County. Accordingly, under the thresholds of significance listed in the EIR, this yearly impact would qualify as a significant environmental effect." (*King & Gardiner*, *supra*, at pp. 875–876.)

Later, the opinion described the resulting noncompliance with CEQA by stating the Board's finding that the project's estimated conversion of agricultural land was an impact that " 'would be less than significant with mitigation' " was a "finding as to the effectiveness of MM 4.2-1 [that was] not supported by substantial evidence and [wa]s based on a legally incorrect view of the operation of [ACE's]." (*King & Gardiner, supra,* 45 Cal.App.5th at p. 878.) Our ultimate conclusion was that "the EIR and the Board's finding as to the mitigation of a significant impact on agricultural land d[id] not comply with CEQA." (*Id.* at p. 879.)

### 2. *Proposed Interpretations*

The County's interpretation of the 2020 opinion is set forth in the final SREIR's responses to comments. Response No. 0004-2 explained:

> "The SREIR … has an expanded discussion explaining that, based on the court's analysis, it is not possible to reduce a projects impact on agricultural land by requiring a conservation easement because such easements do not offset the loss of agricultural land in whole or in part. Since an agricultural

19.

conservation easement does not create new agricultural land to replace the agricultural land being converted to other uses at the end of each year there would be a net loss of agricultural land equal to the amount converted by the Project and the Project's impact on agricultural land would remain significant despite the implementation of the easement. Accordingly, under the threshold of significance in the SREIR, conservation easements do not provide an effective means of even partial mitigation for agricultural conversion impacts."

Thus, the County argues it cannot legally rely on ACE's to mitigate the farmland conversion impact. In contrast, Lions Farming asserts the 2020 opinion did not conclude ACE's are categorically ineffective at providing *any* type of CEQA mitigation, but determined that ACE's alone would not be effective *at reducing the project-specific impacts to a less than significant level* because ACE's could not ensure no net loss of farmland. To determine which interpretation is correct, we apply the rules for construing an opinion set forth in part II.A.2., *ante*.

C.     Construing the Opinion

1.     *Threshold Question of Ambiguity*

Pursuant to the general rules of construction that apply to writings, we begin by considering whether the conclusion "that MM 4.2-1.a does not provide *effective mitigation* for the conversion of agricultural land" (*King & Gardiner*, *supra*, 45 Cal.App.5th at p. 876, italics added) and other statements about the effectiveness of ACE's as mitigation are ambiguous. We conclude the statements are ambiguous because, taken alone, they can be interpreted broadly as proposed by the County.

The conclusion that ambiguities exist also is supported by a CEQA practice guide's discussion of *Masonite*, *supra*, 218 Cal.App.4th 230, *King & Gardiner*, *supra*, 45 Cal.App.5th 814, and the 2018 amendment to Guidelines section 15370, subdivision (e) along with the practice guide's statement that "it is unclear whether it would be appropriate for a lead agency to find that requiring an off-site conservation easement as mitigation is sufficient to 'avoid,' 'minimize,' or 'substantially lessen' the impact to

20.

farmland that results when it is developed."  (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act, *supra,* § 13.72, pp. 13-100 to 13-101.)

### 2.  *Narrow Scope of the 2020 Opinion*

The ambiguity in the 2020 opinion is resolved by applying the rules of construction described earlier.  Although those rules do not inquire into actual intent, we confirm that the result produced by applying those rules reflects the actual intent of the 2020 opinion because we did not intend to adopt any principle of law about mitigation that was not needed to decide the particular issue presented.  (*Ginns v. Savage*, *supra*, 61 Cal.2d at p. 524, fn. 2 [opinions are "understood in the light of the facts and the issue then before the court"].)  The particular issue presented was whether the mitigation measure authorizing the use of ACE's supported the Board's finding that the project's estimated annual conversion of 298 acres of farmland "would be reduced to a less than significant level."  (*King & Gardiner*, *supra*, 45 Cal.App.5th at p. 872.)

The scope of this issue impliedly limited what the opinion meant by "effective mitigation."  Specifically, to be regarded as "effective mitigation" in the context presented, ACE's would need to reduce or offset the project-specific impact "to a less than significant level."  (*King & Gardiner*, *supra*, 45 Cal.App.5th at p. 872.)[6]  To explain the limitation resulting from the issue presented, we turn to the definitions of "project-specific impact" and "threshold of significance."

---

[6]    A footnote in *King & Gardiner* stated our view that the determinations in *Masonite* did not contradict our conclusion that the absence of an offset by the ACE's "means a project's significant impact on agricultural land would remain significant after the implementation of the [ACE]."  (*King & Gardiner*, *supra*, at p. 875, fn. 32 and accompanying text.)  The footnote explained the lack of contradiction by stating in part: "In *Masonite*, the court did not consider the net effect of implementing an agricultural conservation easement *and* whether a significant impact could be reduced to a less than significant level by such an easement."  (*Ibid*., italics added.)  That explanation would have been clearer if the italicized "and" had been replaced with the phrase "in the context of deciding the narrow question of."

21.

" 'Project-specific effect' means all the direct or indirect environmental effects of a project other than cumulative effects and growth-inducing effects." (Guidelines, § 15191, subd. (j) [same]; see Guidelines, § 15358, subd. (a) [direct and indirect effects defined].) In this case, the project-specific impact is the estimated conversion of 298 acres of agricultural land per year, which is the amount predicted in both the EIR and SREIR.[7] (See *King & Gardiner*, *supra*, 45 Cal.App.5th at p. 870.) They also predicted a maximum (i.e., worst-case) conversion of 7,450 acres of farmland between 2015 and 2040, which was less than 1 percent of the farmland in Tier 2 of the project area. (*Id*. at p. 871.)

Next, we compare the estimated conversion of agricultural land to the applicable threshold of significance. "A threshold of significance is an identifiable quantitative, qualitative or performance level of a particular environmental effect, non-compliance with which means the effect will normally be determined to be significant by the agency and compliance with which means the effect normally will be determined to be less than significant." (Guidelines, § 15064.7, subd. (a).) The EIR and the SREIR described the applicable threshold of significance by stating the conversion of *any* agricultural land would be considered a significant impact. (See *King & Gardiner*, *supra*, 45 Cal.App.5th at p. 871.) Applying this threshold to the project-specific effect, both the EIR and the SREIR concluded the conversion of agricultural land was considered significant. (*Ibid*.)

Consequently, under the threshold of significance adopted by the County, ACE's would be "effective" for purposes of the issue addressed in the 2020 opinion only if they reduced or offset the conversion of farmland to zero acres. Stated another way, the ACE's would have had to achieve no net loss of agricultural land to render the conversion insignificant. As a result, the 2020 opinion's statement that ACE's were not

---

[7]     The SREIR continued to use the EIR's estimate despite a March 2021 staff report on the Revised Ordinance stating: "The actual[] permitting from 2015, to March 2020, resulted [in] impacts to 54.18 acres with an average of 12 acres per year."

"effective mitigation" and did not support the Board's finding, meant ACE's would not reduce or offset the conversion of farmland to zero and, therefore, the project's conversion of agricultural land would remain significant after implementation of ACE's. In other words, "[a]t the end of each year, there would be 2[98] fewer acres of agricultural land in Kern County. Accordingly, under the thresholds of significance listed in the EIR, this yearly impact would qualify as a significant environmental effect." (*King & Gardiner*, *supra*, 45 Cal.App.5th at p. 876.)

Therefore, based on the issue actually presented and decided in *King & Gardiner*, *supra*, 45 Cal.App.5th 814, we conclude the County construed the opinion too broadly and mistakenly concluded the opinion established the principle that ACE's "do not provide an effective means of even partial mitigation for agricultural conversion impacts." Because the opinion did not decide, one way or the other, whether ACE's provide some form of mitigation despite their inability to reduce or offset the project's conversion of farmland to zero acres, the County's misreading of the opinion, by itself, does not establish the County violated CEQA. The County may have properly interpreted CEQA and the Guidelines when it determined that ACE's provide no mitigation of any type for the conversion of agricultural land. Accordingly, we now turn to whether ACE's qualify as a type of mitigation despite their inability to achieve no net loss of farmland. This inquiry is focused on whether ACE's provide *compensatory* mitigation.

### D. ACE's and Compensatory Mitigation

#### 1. *Background*

CEQA and the federal legislation on which it was modeled, the National Environmental Policy Act of 1969 (NEPA; 42 U.S.C. section 4321, et seq.), do not themselves define "mitigation." Instead, the term is defined in regulations. (Guidelines, § 15370; 40 C.F.R. § 1508.1(s) (2023); 28 C.F.R. § 91.51(c) (2023).)

The federal definition of mitigation was adopted in 1978 as part of the regulations implementing the procedural provisions of NEPA. (43 Fed.Reg. 55978, 56005 (Nov. 29, 1978).) " 'Mitigation' includes: [¶] (a) Avoiding the impact altogether by not taking a certain action or parts of an action. [¶] (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation. [¶] (c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment. [¶] (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action. [¶] (e) Compensating for the impact by replacing or providing substitute resources or environments." (*Ibid*.; see 40 C.F.R. § 1508.20 (1979).) This language remains unchanged in the five examples of mitigation contained in the current NEPA regulation. (See 40 C.F.R. § 1508.1(s)(1)-(5) (2023).)

In 1983, the Guidelines were amended to add a definition of mitigation that "originally mirrored the definition contained in the federal NEPA regulations." (Natural Resources Agency, Final Statement of Reasons for Regulatory Action Amendments to the State CEQA Guidelines (Nov. 2018) p. 64 (FSOR 2018); see Register 83, No. 29-B (July 16, 1983) p. 322.52.) The only difference in language was that subdivision (c) of Guidelines section 15370 referred to the "impacted environment" instead of the "affected environment." In 2018, subdivision (e) of Guidelines section 15370 was amended to include a clause referring to conservation easements:

> "Compensating for the impact by replacing or providing substitute resources or environments, *including through permanent protection of such resources in the form of conservation easements*." (Guidelines, § 15370, subd. (e), italics added; see FSOR 2018, *supra*, at pp. 92–93.)

The fundamental dispute in this appeal about the use of ACE's as mitigation is whether the preservation of existing agricultural land qualifies as compensatory mitigation by "providing substitute resources." (Guidelines, § 15370, subd. (e).) The dispute about whether preservation should constitute compensatory mitigation is not new. Nearly a decade ago, commentators observed that "one of the central concerns with

24.

preservation as mitigation is that it does not prevent net loss of habitat." (Morris & Owley, *Mitigating the Impacts of the Renewable Energy Gold Rush* (Winter 2014) 15 Minn. J.L. Sci & Tech. 293, 369.) The commentators argued preservation as mitigation is unsatisfying because preservation "generally protects off-site habitat without truly offsetting project impacts." (*Ibid.*) The County has made the same argument here, which interprets the term "mitigation" narrowly to require a replacement or offset that can be quantified and compared to the quantity of farmland converted.

As context for our textual analysis of Guidelines section 15370, we consider how federal agencies have dealt with preservation as a form of compensatory mitigation. A review of their approach is useful because CEQA was modeled on NEPA and California courts treat judicial and administrative interpretations of the federal act as persuasive authority in interpreting CEQA. (See *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 565, fn. 4.) Also, we have located no published California decision discussing the federal view of compensatory mitigation and the preservation of existing resources.

### 2. *Federal Approach to Compensatory Mitigation*

Initially, we note definition of mitigation in the NEPA regulations is not applied only to activities exclusively within the jurisdiction of the United States Environmental Protection Agency (EPA). The NEPA regulation defining mitigation and other terms states: "Federal agencies shall use these terms uniformly throughout the Federal Government." (40 C.F.R. § 1508.1.) Consequently, other federal regulations also state that mitigation includes "compensating for the impact by replacing or providing substitute resources or environments." (1 C.F.R. § 601.3 [National Capital Planning Commission definition of mitigation]; 10 C.F.R. § 960.2 [Department of Energy definition of mitigation]; 32 C.F.R. § 651.15(a)(5) [Department of the Army definition of mitigation]; 43 C.F.R. § 3809.5 [Bureau of Land Management definition of mitigation].)

Although the NEPA regulations do not contain a definition of "compensatory mitigation," other regulations developed jointly by the EPA and other federal agencies define the term. For example, the EPA and U.S. Army Corps of Engineers (Corps) have adopted regulations containing standards and criteria for the use of compensatory mitigation in connection with the Corps' issuance of permits under section 404 of the Clean Water Act (33 U.S.C. § 1344). (40 C.F.R. § 230.91(a)(1); see generally, 40 C.F.R. § 230 [Subpart J — Compensatory Mitigation for Losses of Aquatic Resources].) Those regulations state:

> "*Compensatory mitigation* means the restoration (re-establishment or rehabilitation), establishment (creation), enhancement, and/or *in certain circumstances preservation of aquatic resources* for the purposes of offsetting unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization has been achieved. [¶] … [¶]

> "*Preservation* means the removal of a threat to, or preventing the decline of, aquatic resources by an action in or near those aquatic resources. This term includes activities commonly associated with the protection and maintenance of aquatic resources through the implementation of appropriate legal and physical mechanisms. Preservation does not result in a gain of aquatic resource area or functions." (40 C.F.R. § 230.92, italics added.)

In adopting this regulation, the EPA and Corps provided the following summary: "Compensatory mitigation can be carried out through four methods: the restoration of a previously-existing wetland or other aquatic site, the enhancement of an existing aquatic site's functions, the establishment (i.e., creation) of a new aquatic site, or the preservation of an existing aquatic site." (*Compensatory Mitigation for Losses of Aquatic Resources*, 73 Fed.Reg. 19594–01, 19594 (April 10, 2008); see *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, *supra*, 833 F.3d at p. 1281.) Of interest for this appeal are the comments presented to the agencies that, like the County's argument, asserted preservation alone was not a form of compensatory mitigation because it failed to

promote no net loss of wetlands.  In response, the agencies stated that, under part 203.93(h)(2) of title 40 of the Code of Federal Regulations:

> "[P]reservation will be provided [only] in conjunction with aquatic resource restoration, establishment, and/or enhancement activities, unless the district engineer waives this requirement in a situation where preservation has been identified as a high priority using a watershed approach.  If the district engineer makes such a waiver, a higher compensation ratio shall be required.  For each mitigation bank and in-lieu fee project involving preservation, the district engineer, in consultation with the [Interagency Review Team], will determine the number of credits that will result from that preservation activity."  (*Compensatory Mitigation for Losses of Aquatic Resources*, *supra*, 73 Fed.Reg. at p. 19635; see 33 C.F.R. §§ 332.2 [definition of compensatory mitigation], 332.3(a)(2) [compensatory mitigation may be performed by using preservation in certain circumstances, with restoration generally being the first option], 332.3(h)(1) [criteria for using preservation as compensatory mitigation].)

Similar restrictions on the use of preservation appear in other federal regulations.  "Compensatory mitigation means the restoration (reestablishment or rehabilitation), establishment (creation), enhancement, and/or, *in certain circumstances, preservation of aquatic resources* for the purposes of offsetting unavoidable adverse impacts that remain after all appropriate and practicable avoidance and minimization have been achieved."  (24 C.F.R. § 55.2(a)(2), italics added; see 24 C.F.R. § 55.20(e)(2) [compensatory mitigation includes the use of preservation easements or protective covenants; use of compensatory mitigation is not a substitute for avoiding or minimizing impacts to the maximum extent practicable].)  A regulation adopted by the Federal Highway Administration states in part:  "Compensatory mitigation means restoration, enhancement, creation, and *under exceptional circumstances, preservation*, of wetlands, wetland buffer areas, and other natural habitats."  (23 C.F.R. § 777.2, italics added; cf. *Northwest Bypass Group v. U.S. Army Corps of Engineers* (D.N.H. 2008) 552 F.Supp.2d 97, 120 [guidance letter issued by the Corps states " '[p]reservation does not result in a gain of wetland acres and will be used only in exceptional circumstances' "].)

In 1996, the United States Fish & Wildlife Service and the National Marine Fisheries Service issued the Habitat Conservation Plan Handbook, which states: "Potential types of habitat mitigation include, but are not limited to: (1) acquisition of existing habitat; (2) *protection of existing habitat through conservation easements* or other legal instruments; (3) enhancement or restoration of disturbed or former habitat; (4) prescriptive management of habitat to achieve specific biological characteristics; and (5) creation of new habitats." (*Id*. at pp. 3-21 to 3-22, italics added.) The first two mitigation options do not lead to increased habitat but protect habitat that already exists. (Owley, *The Increasing Privatization of Environmental Permitting* (2013) 46 Akron L.Rev. 1091, 1101.) Professor Owley also asserted that preservation of habitat was the most common mitigation technique. (*Ibid*.)

To summarize, federal agencies treat compensatory mitigation as including preservation of existing habitat, but usually restrict the use of preservation to exceptional circumstances. Despite this restriction, preservation is a common type of mitigation.

### 3. *Principles for Interpreting the Guidelines*

Before analyzing the text of Guidelines section 15370, subdivision (e), we describe the principles governing its interpretation. When interpreting the Guidelines, courts usually apply the same rules that govern the interpretation of statutes. (*Los Angeles Dept. of Water & Power v. County of Inyo* (2021) 67 Cal.App.5th 1018, 1037 [the existence of ambiguity is the threshold inquiry when interpreting a regulation] (*County of Inyo*).) Under those rules, the interpretation of Guidelines section 15370 presents a question of law that is subject to our independent review. (See *BullsEye Telecom, Inc. v. Public Utilities Com.* (2021) 66 Cal.App.5th 301, 309 [questions of statutory interpretation are questions of law subject to independent review].) The threshold inquiry is whether the regulatory text is ambiguous. (*County of Inyo*, *supra*, at p. 1037.) If the text contains ambiguities, the next step is to resolve those ambiguities.

28.

(*Id*. at p. 1039.) Generally, a court's primary goal when construing an ambiguous Guideline is to adopt the interpretation that best effectuates the legislative and regulatory intent or purpose. (*Ibid*.)

### 4. *The Ambiguities*

Guidelines section 15370, subdivision (e) states that mitigation includes: "Compensating for the impact by replacing or providing substitute resources or environments, including through permanent protection of such resources in the form of conservation easements." Initially, we consider whether the clause "including through permanent protection of such resources in the form of conservation easements" unambiguously requires ACE's to be treated as a type of compensatory mitigation in all situations where a project converts agricultural land to other uses. (Guidelines, § 15370, subd. (e).)

The County argues the clause does not, emphasizing the term "such resources." The County asserts that term refers back to earlier language in the subdivision and, to fall within the earlier language, the ACE "must result in 'substitute resources or environments' being 'replac[ed] or provid[ed.]' " We accept the County's construction of the term "such resources." As a result, the clause "including through permanent protection of such resources in the form of conservation easements" (Guidelines, § 15370, subd. (e)) does not unambiguously require ACE's to be accepted as compensatory mitigation in all situations where agricultural land is converted. Instead, to determine whether an ACE is mitigation that "[c]ompensat[es]" for the conversion of agricultural land depends on whether the ACE "replac[es] or provid[es] substitute resources or environments." (Guidelines, § 15370, subd. (e).) Consequently, we next consider whether "replacing or providing substitute resources or environments" is ambiguous. (*Ibid*.) We address the two verbs—replacing and providing—separately.

29.

The County argues ACE's do not replace the converted farmland and cites the 2020 opinion's statement that "[e]ntering into a binding agricultural conservation easement does not create new agricultural land to *replace* the agricultural land being converted to other uses." (*King & Gardiner*, *supra*, 45 Cal.App.5th at p. 875, italics added; see *Masonite*, *supra*, 218 Cal.App.4th at p. 238 ["an ACE does not replace the onsite resources"].) Accordingly, we conclude (1) the verb "replacing" is not ambiguous in the context of this case and (2) the use of ACE's would not compensate for the conversion of 298 acres of agricultural land per year by "replacing" the converted acres. (Guidelines, § 15370, subd. (e).)

Next, we consider whether the verb "providing" and the term "substitute resources or environments" contain ambiguities. (Guidelines, § 15370, subd. (e).) The Guidelines do not define the verb "providing" or the term "substitute resources." One dictionary definition of the verb "[p]rovide" is "[t]o make, procure, or furnish for future use, prepare. To supply, to afford, to contribute." (Black's Law Dict. (6th ed. 1990) p. 1224.) Another dictionary states that "provide" and "supply" are often interchangeable and the former "may suggest equipping, stocking, or giving in the interest of preparing with foresight." (Webster's Third New Internat. Dict. (1993) p. 1827.)

The County's briefing suggests the verb "providing" should be interpreted to mean "replacing." We reject this suggestion because such an interpretation would make the term "providing" redundant and such interpretations are disfavored. (See *Kern County Hospital Authority v. Dept. of Corrections & Rehabilitation* (2023) 91 Cal.App.5th 1313, 1326 [courts avoid an interpretation that renders regulatory language mere surplusage].) The County's briefing also suggests that "providing" is not the equivalent of preserving or protecting in perpetuity. In our view, the verb "providing" could be reasonably construed narrowly to mean supplying something new, while excluding the preservation of something that already exists. Alternatively, "providing" could be reasonably construed more broadly to include preserving (i.e., protecting in perpetuity) because

30.

preserving and protecting in perpetuity could be equated to "giving in the interest of preparing with foresight" (Webster's Third New Internat. Dict., *supra*, p. 1827) against long term depletion of agricultural land. Based on the different ways the verb "providing" could be interpreted, we conclude it is ambiguous in the context of this case.

ACE's must "provid[e] *substitute resources or environments*" for the converted agricultural land to qualify as compensatory mitigation. (Guidelines, § 15370, subd. (e).) The usual or ordinary meaning of the noun "substitute" is "that which stands in place of another; that which stands in lieu of something else" and the verb form means "[t]o put in the place of another person or thing; to exchange." (Webster's Third New Internat. Dict., *supra*, at p. 1429.) Taking these definitions into consideration, we conclude the term "substitute resources" is ambiguous. It could be interpreted narrowly to mean that, immediately after the substitute acreage has been provided, the amount of land suitable for agricultural use is the same—that is, there is no net loss of farmland. (See generally, Malloy, *Symbolic Gestures or Our Saving Grace: The Relevance of Compensatory Mitigation for Florida's Wetlands in the Climate Change Era* (2011) 27 J. Land Use & Envtl. L. 103, 105 [no net loss policy adopted in 1989 by President Bush designed to ensure total acres of wetlands remained constant].) This interpretation of what constitutes "substitute resources" focuses on the immediate result. Alternatively, it could be interpreted broadly to refer to other land that will be available in the future to grow crops that could no longer be grown on the land being converted. Based on these different interpretations, we conclude that, in the context of this case, the term "substitute resources" is ambiguous. (Guidelines, § 15370, subd. (e).)

### 5. *Resolving the Ambiguities*

Having determined the phrase "providing substitute resources or environments" and the derivative term "such resources" (Guidelines, § 15370, subd. (e)), are ambiguous, the next step is to resolve the ambiguities. That step involves an independent review and

31.

our adoption of the interpretation that best effectuates the purpose of CEQA. (See *County of Inyo*, *supra*, 67 Cal.App.5th at p. 1039.)

In 2018, the Natural Resources Agency explained the purpose of adding the phrase "including through permanent protection of such resources in the form of conservation easements" to subdivision (e) of section 15370 by stating:

> "[We] revised Section 15370 of the CEQA Guidelines, however, to clarify in the CEQA Guidelines that permanent protection of off-site resources through conservation easements constitutes mitigation. The proposed changes incorporate the First District Court of Appeal holding in *Masonite Corporation v. County of Mendocino* (2013) 218 Cal.App.4th 230 wherein the court ruled that off-site agricultural conservation easements constitute a potential means to mitigate for direct, in addition to cumulative and indirect, impacts to farmland." (FSOR 2018, *supra*, at p. 64.)

Based on the role *Masonite* played in the amendment of section 15370, subdivision (e), we next describe that decision. In *Masonite*, the First District reversed a judgment denying a petition for writ of mandate, and directed the issuance of a writ requiring the county to (1) set aside its certification of the EIR and approval of permits for a quarry project and (2) correct deficiencies in the EIR involving ACE's as mitigation for the conversion of agricultural land. (*Masonite*, *supra*, 218 Cal.App.4th at p. 242.) The court rejected the respondents' contention that ACE's were legally infeasible and concluded "that ACEs may appropriately mitigate the direct loss of farmland when a project converts agricultural land to a nonagricultural use, *even though an ACE does not replace the onsite resources*." (*Masonite*, *supra*, 218 Cal.App.4th at p. 238, italics added.) The court stated its conclusion was "reinforced by the CEQA Guidelines, case law on offsite mitigation for loss of biological resources, case law on ACEs, prevailing practice, and the public policy of this state." (*Ibid*.) The court then explained:

> "ACEs preserve land for agricultural use in perpetuity. (See Civ.Code, §§ 815.1, 815.2 [describing agricultural and other conservation easements]; Pub. Resources Code, § 10211 [defining 'agricultural conservation easement'].) As the California Farm Bureau Federation

32.

(CFBF) observes in an amicus curiae brief advocating for the conclusion we reach: 'The permanent protection of existing resources off-site is effective mitigation for [a project's direct, cumulative, or growth-inducing] impacts because it prevents the consumption of a resource to the point that it no longer exists.... If agricultural land is permanently protected off-site at, for example, a 1:1 replacement ratio, then at least half of the agricultural land in a region would remain after the region has developed its available open space.' *By thus preserving substitute resources, ACEs compensate for the loss of farmland within the Guidelines' definition of mitigation.* (Guidelines, § 15370, subd. (e) [mitigation includes '[c]ompensating for the impact by replacing or providing substitute resources or environments'].)" (*Masonite*, *supra*, 218 Cal.App.4th at p. 238, italics added.)

Although not stated in detail, the foregoing demonstrates that the First District interpreted the phrase "providing substitute resources" to encompass preserving (i.e., permanently protecting) existing agricultural land. (Guidelines, § 15370, subd. (e).)

As further support for its conclusion that ACE's mitigate the conversion of agricultural land despite not replacing the converted land, the First District noted the cases accepting offsite preservation of habitats for endangered species as a means of mitigating impacts on biological resources and stated there was no good reason to distinguish the use of offsite ACE's to mitigate the conversion of agricultural land. (*Masonite*, *supra*, 218 Cal.App.4th at pp. 238–239, citing *Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 278 [loss of habitat mitigated by conservation of other habitat at a one-to-one ratio]; *California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 610–611, 614–626 [mitigation by offsite preservation of two acres of existing habitat or creation of one acre of new habitat for each acre of habitat impacted by the project]; *Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 794 [mitigation by "off-site preservation of similar habitat"]; *Environmental Council of Sacramento v. City of Sacramento* (2006) 142 Cal.App.4th 1018, 1038 [purchase of a half-acre for habitat reserves for every acre of development].)

In addition, the First District discussed the "relatively sparse case law involving ACEs" and determined those cases supported its conclusion. (*Masonite*, *supra*, 218 Cal.App.4th at pp. 239–240.) The court also noted ACE's are commonly used in California as mitigation. (*Id*. at p. 240.) Finally, the court stated the Legislature had declared that the preservation of agricultural land is an important public policy and had declared CEQA was intended to effectuate the policy. (*Masonite, supra,* at pp. 240–241, citing Stats. 1993, ch. 812, § 1, p. 4428.)

The interpretation in *Masonite* of what constitutes compensatory mitigation for purposes of Guidelines section 15370, subdivision (e) was confirmed by the First District about nine years later when it rejected the argument that protection of an 85-acre site "under a conservation easement would not result in the provision of any new resources to offset or *compensate* for the [32 acres of] habitat permanently lost to the Project." (*Save the Hill Group v. City of Livermore* (2022) 76 Cal.App.5th 1092, 1117, italics added.)

Our inquiry into the meaning of compensatory mitigation does not end with the First District's interpretation of Guidelines section 15370, subdivision (e) because there is no horizontal stare decisis within the California Court of Appeal. Also, while courts ordinarily give deference to how the promulgating agency has interpreted its regulation (*Fischl v. Pacific Life Insurance Company* (2023) 94 Cal.App.5th 108, 122), we conclude the Natural Resources Agency's interpretation of an ambiguous Guideline is not binding on the courts. Under Government Code section 11342.2, "no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute." We infer from this provision that the *interpretation* of an ambiguous Guideline also must be consistent and not in conflict with CEQA and reasonably necessary to effectuate CEQA's purpose. (See generally, *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 105 [upholding invalidation of certain CEQA Guidelines].)

The main purpose of CEQA is "to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.) Thus, "CEQA is to be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Ibid.*) Another purpose is identified in the Legislature's declaration that CEQA "plays an important role in the preservation of agricultural lands." (Stats. 1993, ch. 812, § 1, subd. (d), p. 4428; see *Masonite*, *supra*, 218 Cal.App.4th at p. 241.)

Interpreting the verb "providing" to encompass preserving or permanently protecting and the term "substitute resources" (Guidelines, § 15370, subd. (e)) to include existing agricultural land would promote the use of ACE's, which would advance CEQA's purpose of long term protection of the environment and its specific role of preserving agricultural land. In comparison, the interpretation that existing agricultural land is not a "substitute resource" for purposes of compensatory mitigation would diminish the use of ACE's and result in less long term protection of California's agricultural land. Therefore, the interpretation offered by the County is not the one that best effectuates CEQA's purpose. As a result, we conclude the phrase "providing substitute resources" (Guidelines, § 15370, subd. (e)) includes preserving (i.e., permanently protecting) existing agricultural land. Consequently, ACE's are a type of compensatory mitigation for the conversion of agricultural even though, operating by themselves, they do not replace the converted land or otherwise result in no net loss of agricultural land. (See generally, *Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th at p. 523 [mitigation measures must be at least partially effective, even if they cannot mitigate significant impacts to less than significant levels].)[8]

---

[8] Based on this interpretation, we do not consider whether ACE's provide a type of mitigation for purposes of CEQA that is not among the five examples set forth in subdivisions (a) through (e) of Guidelines section 15370. The latter question arises from the use of "includes" before the list of examples in Guidelines section 15370. (See *Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1101 ["includes" ordinarily is "a term of

Consequently, the County failed to comply with CEQA when it eliminated the use of ACE's as a mitigation measure for the conversion of agricultural land in situations where the permit applicant's adoption of other mitigation has not reduced the net loss of agricultural land to zero acres.[9]  To remedy that noncompliance, the superior court shall issue a fourth peremptory writ of mandate directing the County to take corrective action before reapproving the Revised Ordinance.  (§ 21168.9, subd. (b).)

III.    MITIGATION OF PM2.5 EMISSIONS[*]

A.    Background

1.    *Prior CEQA Violations*

In *King & Gardiner*, *supra*, 45 Cal.App.5th 814, Sierra Club challenged the mitigation measures for air quality impacts on several grounds.  Our discussion of those challenges was not published.  (*Id*. at pp. 870, 900.)  One challenge asserted the mitigation measure for criteria pollutants,[10] MM 4.3-8, should have separately addressed

---

enlargement rather than limitation"].)  Also, because ACE's are effective at providing compensatory mitigation for project-specific impacts, the question whether they are effective at *only* addressing cumulative impacts to agricultural land does not arise.

[9]    For some but not all permit applications, the mitigation measure requiring the removal of unused legacy equipment and restoration of the surface will offset the conversion of farmland caused by the drilling of a new well.  Where an applicant's proposed conversion of farmland is completely offset by other mitigation, it would be inappropriate to also require the applicant to provide compensatory mitigation, such as an ACE.

[*]    See footnote, *ante*, page 1.

[10]    The EPA has established health-based ambient air quality standards, or allowable limits, for seven "criteria pollutants"—ozone, carbon monoxide, nitrogen dioxide (NO2), sulfur dioxide (SO2), lead, respirable particulate matter (PM10), and PM2.5.  PM10 refers to particulate matter of 10 microns or less in diameter.  (40 C.F.R. § 50.6(a); Cal. Code Regs., tit. 17, § 70100, subd. (i) [definition of suspended particulate matter (PM10)].)  Because PM2.5 refers to particulate matter of 2.5 microns or less in diameter, it is necessarily a subset of PM10.  (40 C.F.R. § 50.7(a); Cal. Code Regs., tit. 17, § 70100, subd. (j).)

PM2.5 and should have provided enforceable mitigation for that pollutant. That challenge succeeded when we identified two CEQA violations that involved MM 4.3-8:

> "First, the EIR did not discuss the impact of the measure on PM2.5 emissions or, alternatively, provide a rational explanation for why there is no separate discussion of the measure's impact on PM2.5 emissions. Second, MM 4.3-8 does not provide for enforceable mitigation of PM2.5 emissions, and there is no finding that mitigation of this specific pollutant was not feasible. These deficiencies must be remedied on remand."

### 2. Revisions After Remand

The County attempted to remedy the CEQA violations identified in this court's opinion and the superior court's writs of mandate by (1) preparing an SREIR with an extensive discussion of PM2.5 emissions, (2) certifying the completion of the SREIR, (3) adopting a clarified MM 4.3-8 that explicitly referred to PM2.5 emissions, and (4) amending the oil and gas emission reduction agreement with the Air District (OG-ERA) to explicitly address PM2.5.

The SREIR's discussion of PM2.5 emissions describes the attainment status of the San Joaquin Valley Air Basin (SJVAB) for PM2.5, attainment plans for PM2.5, and potential adverse health effects of PM2.5 emissions. It states the SJVAB has not attained federal or California PM2.5 standards, has not attained California PM10 standards, and has attained federal PM10 standards. The SREIR includes a table summarizing ambient PM10 and PM2.5 data collected at monitoring stations in Kern County, a 2012 baseline of criteria pollutant emissions, significance thresholds for criteria pollutants (including PM10 and PM2.5), and several tables estimating emissions that would be caused by the project.

The SREIR also attempts to clarify the enforceability and impact of MM 4.3-8 on PM2.5 emissions. As revised, the first two paragraphs of the MM 4.3-8 now provide:

> "For criteria emissions not required to be offset under a District rule as described in MM 4.3-1, and for Project vehicle and other mobile source emissions, the County will enter into an emission reduction agreement with

37.

the [Air] District, pursuant to which the Applicant shall pay fees to fully offset Project emissions of $NO_x$ (oxides of nitrogen), ROG (reactive organic gases), $PM_{10}$ (particulate matter of 10 microns or less in diameter) and $PM_{2.5}$ (particulate matter of 2.5 microns or less in diameter) (including as applicable mitigating for reactive organic gases by additive reductions of particulate matter of 10 microns or less in diameter) (collectively, 'designated criteria emissions') to avoid any net increase in these pollutants.  The air quality mitigation fee shall be paid to the County as part of the Site Plan review and approval process, and shall be used to reduce designated criteria emissions to fully offset Project emissions that are not otherwise required to be fully offset by District permit rules and regulations.

"As an alternative to paying the fee, an Applicant may reduce emissions for one or more designated criteria emissions through actual reductions in air emissions from other Applicant sources, as submitted to the County and validated by the [Air] District.  This Project offset requirement alternative shall be enforced by the County and verified by [Air] District, and must be approved in advance by the [Air] District.  If a voluntary emission reduction agreement is not executed by the County and [Air] District, then each Applicant must mitigate for the full amount of designated criteria pollutants as verified by the [Air] District, with evidence of such District-verified offsets presented as part of the Site Plan Conformity Review application documentation."

Thus, MM 4.3-8 provides two pathways for mitigating emissions of criteria pollutants—either activities undertaken directly by the applicant or activities funded by the applicant's fees in accordance with the terms of the OG-ERA.  The third paragraph of MM 4.3-8 provides examples of feasible air emission reduction activities that might be implemented under either pathway.

The OG-ERA was revised to mention PM2.5 in two places.  First, a recital in the amended OG-ERA states that MM 4.3-8 requires applicants for permits issued under the Revised Ordinance to fully mitigate emissions of oxides of nitrogen, reactive organic compounds, PM10, and PM2.5 "through emission reductions that are either: (1) implemented by the Applicant, with the quantity of emission reduction verified by the [Air] District; or (2) funded by the Applicant through the [Air] District's incentive programs, as described below."  Section 1 of the amended OG-ERA provides:

"Project-related Criteria Pollutant Emissions not required to be offset per [Air] District rules shall be fully mitigated by achieving surplus, quantifiable and enforceable emission reductions for ROG, NOx, $PM_{10}$ *and* $PM_{2.5}$ (collectively, 'Mitigation of Criteria Pollutants'). 'Surplus' emission reductions are reductions that are not otherwise required by laws or regulations. The determination of whether proposed emission reductions are surplus shall be performed by the [Air] District." (Italics added.)

Subsequent provisions of the OG-ERA address the emission mitigation required, the emission mitigation fee required, and the use of the mitigation fees to reduce emissions. The OG-ERA states that the County and the Air District shall regularly meet and confer regarding potential projects and the final selection of emission reduction projects to be funded by the mitigation fees.

The SREIR explains why table 4.3-32 includes a total PM value (i.e., combines PM10 and its subset, PM2.5) for use in (1) calculating the mitigation fees charged applicants and (2) tracking emission reductions achieved pursuant to the OG-ERA. One reason is that, historically, the Air District has addressed PM2.5 and PM10 jointly in its attainment plans and State Implementation Plan strategies for achieving both PM2.5 and PM10 air quality standards. The Air District explained its approach in responding to comments on a 2018 attainment plan:

" 'The [Indirect Source Review] rule targets NOx and PM10 emissions from mobile source equipment related to the project construction and operational activities. Particulate matter emissions from mobile source equipment emissions are overwhelmingly PM2.5, a subset of PM10. Therefore, the PM10 emission reductions achieved by our emission reduction incentive grants through expenditure of offsite fees collected under [Indirect Source Review] result directly in PM2.5 emission reductions. In other words, PM10 emissions increases are being offset by emission reductions that are overwhelmingly PM2.5, a positive impact on PM2.5 concentrations. Adding a PM2.5 emission reduction requirement to the existing PM10 emission reduction target will not contribute to further reduce actual PM2.5 emissions.' "

The SREIR notes the State Air Resources Board (ARB) has accepted the Air District's approach to PM2.5 attainment and states that, under the Air District's approach,

the calculation of emissions reductions required by the OG-ERA includes PM2.5. The SREIR states that the County has relied on the Air District's judgment that differentiating between PM2.5 and PM10 for purposes of incentive measures and tracking reductions from emission reduction projects (such as the projects funded under the OG-ERA) is not necessary and would not contribute to further reduction of actual PM2.5 emissions. The SREIR justifies this reliance by noting that the Air District is the expert agency with responsibility for air quality in the project area. The SREIR also states it is not currently possible to identify and commit to specific emission reduction projects for each year through 2035 and the OG-ERA provides flexibility to allow the mitigation fees to be spent on the most effective projects available at the time the fees are received.

The SREIR forecasts that implementing MM 4.3-8's two pathways "will offset $NO_x$, $PM_{10}$, and $PM_{2.5}$ emissions to net zero" but states that actual reductions of ROG, $NO_x$, PM10, and PM2.5 "remain impossible to certify as 100% reduced to zero." Due to this uncertainty, the SREIR concludes the project's air quality impacts are significant and unavoidable. It also states: "However, all reasonable and feasible mitigation has been required and will reduce the air emissions as close to a 'no net increase' from the current emissions over the next 21 years as is scientifically possible to quantify and confirm." The SREIR estimates that the mitigation fees collected over the 21-year period will range from $260 million to $2.5 billion.[11]

B.    Contentions of the Parties

Sierra Club contends the County has failed to comply with CEQA because (1) CEQA requires the adoption of particular and fully enforceable mitigation measures for

---

[11]    A table in the SREIR sets forth the yearly amount of mitigation fees paid for permits issued in 2016 through 2019. These fees totaled nearly $88.9 million and accounted for 91 percent of all mitigation fees received by the Air District under its various emission reductions agreements. By 2020, the Air District had entered into a running total of 45 such agreements, which includes the OG-ERA.

the project's PM2.5 emissions; (2) the amended OG-ERA does not provide for such mitigation; and (3) the County's excuses for not adopting particular and fully enforceable mitigation for PM2.5 emissions are unavailing.

The County contends MM 4.3-8 now uses mandatory language requiring applicants to mitigate PM2.5 emissions from project activities to no net increase and, similarly, the OG-ERA was amended to state that PM2.5 is a criteria pollutant that "shall be fully mitigated by achieving surplus, quantifiable and enforceable emission reductions." On the issue of enforceability, the County asserts that, if projects funded through the OG-ERA inadequately mitigate PM2.5 emissions, the Revised Ordinance authorizes the County to take enforcement action and revoke any permit. The County also asserts (1) it will monitor and enforce the required offset of PM2.5 emissions pursuant to the mitigation monitoring and reporting program and (2) the required offset is an enforceable condition of permit issuance.

In response, Sierra Club contends that MM 4.3-8 and the OG-ERA remain unchanged *in substance* because they continue to allow reductions in PM10 to be treated as offsets for PM2.5 emissions. It argues the County's prediction that its approach will, in practice, result in offsetting the project's PM2.5 emissions, is not a lawful substitute for adopting enforceable mitigation that actually requires PM2.5 emissions to be offset.

C.     Mitigation Requirement for PM2.5 is Enforceable

   1.     *Applicable Law*

CEQA provides that a "public agency shall mitigate or avoid the significant effect on the environment of projects that it carries out or approves whenever it is feasible to do so." (§ 21002.1, subd. (b).) "If, after the feasible mitigation measures have been implemented, significant effects still exist, a project may still be approved if it is found that the 'unmitigated effects are outweighed by the project's benefits.' " (*Sierra Club*, *supra*, 6 Cal.5th at p. 524.) Even if a project's benefits outweigh its unmitigated

41.

environmental effects, CEQA requires agencies to implement all mitigation measures unless those measures are truly infeasible. (*Sierra Club, supra,* at pp. 524–525.) Before approving a project that will have significant environmental effects after implementation of all feasible mitigation measures, the agency must adopt a statement of overriding considerations. (*Id.* at p. 525; § 21081, subd. (b) [agency finding that specific benefits outweigh the significant environmental effects]; Guidelines, § 15093 [statement of overriding considerations].) The foregoing requirements reflect the EIR's purpose of identifying the project's significant environmental effects and describing how those effects can be mitigated or avoided. (§ 21002.1, subd. (a); Guidelines, § 15126.4, subd. (a).)

The mitigation measures adopted by a lead agency must be "fully enforceable through permit conditions, agreements, or other measures. Conditions of project approval may be set forth in referenced documents which address required mitigation measures .…" (§ 21081.6, subd. (b).) Echoing this requirement, Guidelines section 15126.4, subdivision (a)(2) states: "Mitigation measures must be fully enforceable through permit conditions, agreements, or other legally-binding instruments." The responsibility of the public agency does not end with simply requiring enforceable mitigation measures. "The public agency shall adopt a reporting or monitoring program for the … conditions of project approval, adopted in order to mitigate or avoid significant effects on the environment." (§ 21081.6, subd. (a)(1).) The purpose of a monitoring program is to ensure compliance with the mitigation measures imposed as conditions of the project approval. (*Ibid*.)

### 2. *Particularity of the Mitigation*

Sierra Club contends a mitigation measure must be particular and fully enforceable. We conclude MM 4.3-8 contains the requisite particularity because, as

clarified in the SREIR, it specifically addresses PM2.5 and PM10 using mandatory language.

First, MM 4.3-8 provides that the County will enter into an emission reduction agreement with the Air District. The County and the Air District have fulfilled this aspect of MM 4.3-8 by adopting, then amending, the OG-ERA.

Second, MM 4.3-8 provides that, pursuant to the OG-ERA, applicants "shall pay fees to fully offset Project emissions of … $PM_{10}$ (particulate matter of 10 microns or less in diameter) and $PM_{2.5}$ (particulate matter of 2.5 microns or less in diameter) … to avoid any net increase in these pollutants." Section 1 of the amended OG-ERA complies with MM 4.3-8 by providing that the project's criteria pollutant emissions "shall be fully mitigated by achieving surplus, quantifiable and enforceable emission reductions for … $PM_{10}$ and $PM_{2.5}$."

As a result, a CEQA defect in the prior version of MM 4.3-8—namely, the failure to address PM2.5 emissions—has been cured. In addition, MM 4.3-8's phrases "fully offset" and "avoid any net increase" adequately describe the standard of mitigation of PM2.5 emissions that must be achieved.

### 3. Enforceability of the Mitigation Standard

Sierra Club's argument that MM 4.3-8 is not fully enforceable as applied to PM2.5 emissions raises two questions. First, does the County have the authority to enforce MM 4.3-8's requirement that PM2.5 emissions be fully offset? Second, if the County shirks its responsibility to enforce the mitigation measure, is there a means for enforcing the mitigation measure? The answer to both questions is yes.

The County contends provisions in the Revised Ordinance provide it with the authority to enforce MM 4.3-8. Section 19.98.040.A of the Revised Ordinance provides that no oil and gas activities may be undertaken until an application for a permit, along with payment of all fees, is submitted to and approved by the planning director as

43.

consistent with section 19.98.060. Section 19.98.060.D of the Revised Ordinance provides that a permit applicant must "comply with all applicable Mitigation Measures as shown in the steps to compliance checklist in the approved Mitigation Monitoring and Reporting Program (MMRP)." To assist the County in determining whether the mitigation requirements are met, item 11 of section 19.98.080.E and item 15 of section 19.98.085.F of the Revised Ordinance provide that the applicant's site plan must include written documentation showing all conditions required by section 19.98.060 will be complied with, including all applicable mitigation measures listed in the MMRP. In accordance with these provisions, if the applicant does not pay the criteria pollutant mitigation fee or satisfy the alternate mitigation pathway, the County will enforce the mitigation measure by refusing to issue a permit. As a result, we conclude that the "measures are not vague as to how they will be [initially] enforced, [because] the County will enforce them during the approval process." (*Sierra Club v. County of Fresno, supra,* 6 Cal.5th at p. 526.)

Next, we consider the County's ability to enforce the mitigation measure *after* the permit has been issued. We consider this issue because of the time lag between an applicant's payment of a mitigation fee and the use of that fee to fund an emission reduction project approved by the Air District. Section 19.98.160 of the Revised Ordinance states that "[a]ny permit issued pursuant to this chapter may be revoked or modified pursuant to Section 19.102.020 of this Title." In turn, section 19.102.020 provides that any permit may be modified or revoked by the official or decision-making body that originally approved the permit by the same procedure under which the permit was issued if "any term or condition of the permit … has not been complied with." Under these provisions, if the County learns that the Air District's emission reduction projects and incentive programs funded with the mitigation fees are not achieving the required level of mitigation of PM2.5 or other criteria pollutants, the County has the authority to revoke the permits issued previously with the expectation that emission

44.

reduction projects would achieve the requisite offsets. Obtaining the information needed to exercise this authority is aided by section 1.3(b) of the OG-ERA, which provides that the Air District and the County shall meet and confer regularly regarding potential emission reduction projects and the final selection of those projects. This contractual provision provides the County with access to information about the emission reduction projects and their effectiveness in offsetting the emissions of criteria pollutants, including PM2.5. Consequently, we conclude the Revised Ordinance and the OG-ERA provide the County with the authority to enforce the mitigation measure for PM2.5 *after* a permit has been issued. Furthermore, the OG-ERA provides a mechanism for obtaining information needed to enforce the mitigation requirements. Stated another way, the County has not forestalled enforcement by agreeing to be kept in the dark.

Consequently, we conclude the County has the authority and the means to enforce MM 4.3-8's requirement that PM2.5 emissions be fully offset, both before and after permits are issued.

The final question about MM 4.3-8's enforceability is what would happen if the County, either inadvertently or intentionally, fails to properly administer that measure. Such a situation could arise if, among other things, the County fails to assure the emission reduction projects funded with the mitigation fees do, in fact, fully offset the PM2.5 emissions.

Our analysis of this question begins with the Board's findings in support of its adoption of the SREIR and approval of the project. In section 1 of the findings, the Board (1) stated "the County hereby binds itself to implement these [mitigation] measures" and (2) found that "[t]he County will use the MMRP to track compliance with Project mitigation measures." As a result, the Board explicitly bound the County to implement the mitigation measures and track compliance pursuant to the MMRP. Any failure of the County to fulfill this duty "would amount to an abuse of discretion, which could be corrected in a court mandamus proceeding." (*Sierra Club v. County of Fresno,*

45.

*supra,* 6 Cal.5th at p. 526; see *Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 727 [abuse of discretion related to dust control mitigation measure "could be remedied through the courts in mandamus"].)

Consequently, we conclude the mitigation measure for PM2.5 emissions is "fully enforceable" as that term is used in section 21081.6, subdivision (b) and Guidelines section 15126.4, subdivision (a)(2) and explained by our Supreme Court in *Sierra Club v. County of Fresno, supra,* 6 Cal.5th 502.

## IV. MULTI-WELL HEALTH RISK ASSESSMENT[*]

### A. Background

#### 1. *Previous Decision*

The introduction to our 2020 opinion stated the conclusions that (1) the Multi-Well Health Risk Assessment prepared in October 2015 by Environmental Compliance Solutions, Inc. constituted new information that had been omitted from the draft EIR; (2) the new information was significant because the draft EIR inadequately addressed the subject of multiple oil wells in a given area and there was no meaningful public review and comment on the new assessment; and (3) the Multi-Well Health Risk Assessment must be included in any revised EIR recirculated to correct the other CEQA violations. (*King & Gardiner*, *supra*, 45 Cal.App.5th at p. 830.) An unpublished part of the opinion set forth the supporting analysis and legal principles. That analysis did not address (1) the adequacy of the discussion in the Multi-Well Health Risk Assessment or (2) the methodologies employed. Our remand order required the superior court to issue a writ of mandate directing the County to (1) recirculate a revised EIR and the Multi-Well Health Risk Assessment for public review and comment and (2) prepare and publish responses to the comments received before certifying the completion of any revised EIR and reapproving the project. (*Id.* at p. 901.)

---

[*] See footnote, *ante*, page 1.

### 2.    *Recirculation of the SREIR*

The County's April 2020 "Initial Study/Notice of Preparation" stated the SREIR, including the Multi-Well Health Risk Assessment, would be recirculated for public review and comment and the County would prepare and publish responses to the comments. The Multi-Well Health Risk Assessment, the June 2015 single-well health risk assessment, and the September 2015 updated single-well health risk assessment were included in appendix B of the SREIR. In addition, a Supplemental Health Risk Assessment Technical Memorandum dated October 2020 (technical memorandum) was included in the SREIR as appendix B-1. The technical memorandum provided a further explanation of the assumptions, modeling, and conclusions in the Multi-Well Health Risk Assessment. An assumption important to this appeal was that the hypothetical sensitive receptor being assessed "had a 300m x 300m (or approximately 1,000 foot fence around it)."

Impact 4.3-3 of the October 2020 draft SREIR addressed the exposure of sensitive receptors[12] to substantial pollutant concentrations and described the three health risk assessments prepared in 2015. The three assessments evaluated potential cancer risks, acute (short term) noncancer risks, and chronic (long term) noncancer risks[13] resulting from toxic emissions associated with oil and gas processing equipment and with well construction, drilling, and completion. Generally, an assessment of health risks involves four steps: (1) hazardous emission estimations, (2) exposure assessment, (3) dose-response assessments, and (4) quantification of potential health risks.

---

**12**    The Revised Ordinance defines a sensitive receptor as a church, hospital, single or multi-family dwelling, or place of public assembly where 100 or more people gather in a building or structure for purposes of amusement, entertainment or retail sales.

**13**    The temporal aspect of these types of risks was defined in a report prepared for Lions Farming by Dr. Phyllis Fox, which stated: "Acute impacts are those that occur over a 1-hour exposure time while cancer and chronic impacts result from a lifetime of exposure."

47.

Each assessment described the guidelines, software, and models used. The assessments followed the California's Office of Environmental Health Hazard Assessment (OEHHA) "Air Toxics Hot Spots Program Risk Assessment Guidelines," as amended in March 2015.  In accordance with the guidelines' recommendation, the assessments used the ARB's "Hotspots Analysis and Reporting Program, Version 2" (HARP2).  HARP2 includes a dispersion module, an exposure-dose module, and a risk module.  The dispersion module incorporates the EPA's AERMOD, which predicts resulting cumulative concentrations from various emission sources.  AERMOD includes a terrain processor, AERMAP, that incorporates actual terrain elevations for sources and receptors.  The Multi-Well Health Risk Assessment stated that five years of meteorological data required for AERMOD was obtained from the Air District.

The draft SREIR stated the Air District's thresholds of significance considered the following risks were acceptable:  (1) a cancer risk equal or less than 10 in one million,[14] (2) a chronic hazard index equal to or less than one, and (3) an acute hazard index equal to or less than one.  It also stated that the 2015 single-well assessments showed the potential cancer risk exceeded the 10 in one million threshold "for drilling a 10,000-foot well in any Project year, for drilling a 5,000-foot well in year 2015, and for operations of the oil processing equipment."  The draft SREIR dealt with the cancer risk associated with well drilling and construction by determining how far a receptor needed to be from the well site and project boundary to have the receptor's risk drop below 10 in one

---

[14]     Section 5.0 of the Multi-Well Health Risk Assessment stated a project's cancer risk equal to or less than 20 in one million is not considered significant under the Air District's published thresholds and, therefore, is acceptable.  Section 1.0 of the September 2015 updated single-well health risk assessment stated the Air District's comment letter to the draft EIR requested that the assessment's results be compared against the Air District's significance threshold for toxic air contaminants of 20 in one million.  Thus, the Board's March 2021 findings in support of the project applied the Air District's risk threshold of 20 in one million.  Similarly, this opinion uses 20 in one million as the significance threshold for cancer risk.

million.  For example, the setback needed for a 10,000 foot-deep well drilled in the western or central subarea was estimated at 367 feet in 2015 and 232 feet in 2020 after stricter diesel emission standards went into effect.  Based on these estimates, MM 4.3-5 provides that where a sensitive receptor is within 4,000 feet of a well construction site, the application must provide information "showing the distance from the closest edge of the well pad to the property line of the nearest sensitive receptor" and the minimum distances shall be 367 feet for a 10,000 foot well in the western or central subarea and 296 feet for a 10,000 foot well in the eastern subarea.  For wells 5,000 feet deep, the setback distance is 116 feet in the western or central subarea and no setback is imposed in the eastern subarea.

The draft SREIR described the Multi-Well Health Risk Assessment and some of its underlying assumptions and noted the primary driver for cancer risk is days of drilling, not well depth.  The draft SREIR stated that under the conservative multi-well scenario assumed, the Multi-Well Health Risk Assessment found the cancer health risk would be 9.3 in one million, which was below the Air District's threshold of 20 in one million.

As to acute and chronic noncancer impacts, the draft SREIR stated they were not considered because approximately 99.9 percent of the risk associated with the multi-well scenario came from diesel particulate matter (DPM) and, as shown in the single-well assessments, the acute and chronic noncancer impacts were well below the Air District's thresholds.  For instance, Table 4.3-36 listed the potential acute impacts identified in the June 2015 single-well health risk assessment as 0.0098 on a scale that regarded the hazard as significant when it was 1.0 or more.

> ### 3.     *Comments to the SREIR*

Lions Farming's September 16, 2020 comment letter asserted the draft SREIR had not corrected defects in the Multi-Well Health Risk Assessment.  The letter referred to Dr. Fox's November 2015 report, which asserted the assessment did not analyze impacts

from multiple wells at densities that actually occur in Kern County. Dr. Fox's report stated that 48 wells drilled in concentric circles around a sensitive receptor in an area with a diameter of one mile (i.e., 2,011 acres) would have only 0.02 wells per acre (or one well per 42 acres) and included photographs of oil fields where well densities were much higher.

Sierra Club's September 16, 2020 comment letter asserted the County must revise the Multi-Well Health Risk Assessment because, among other things, the way the wells were modeled in rings at distances of approximately 0.2 mile, 1/3 mile, 1/2 mile, and one mile created artificially low pollutant concentrations. In addition, the letter asserted the proposed setback requirements were arbitrary and inconsistent.

The ARB's December 14, 2020 comment letter stated the draft SREIR should clearly state the assumptions made in the Multi-Well Health Risk Assessment and asserted the assessment may have severely underestimated the project's potential health risks to residents and communities near drilling and production activities. ARB's comments addressed acute risks and also asserted that, because over 2,000 notices of intent to drill were submitted to the County in 2019 and wells continue to emit pollutants throughout their productive lifespan, the Multi-Well Health Risk Assessment should have examined the lifetime air quality impacts of new wells.

### 4. *The County's Responses to Comments*

The County's response No. 0008-27 addressed in two ways Lions Farming's comment that the well density used in the Multi-Well Health Risk Assessment did not reflect actual well densities in Kern County. First, the response attempted to explain why the well density used was appropriate. It stated the Multi-Well Health Risk Assessment analyzed a well density of approximately 13 wells per square mile and asserted the majority of Kern County has well densities in the range of one to 99 wells per square mile and a much smaller subset of areas have well densities greater than 400 wells per

50.

square mile. The response stated Dr. Fox's suggestion that a well density of more than 600 wells per square mile was common was not supported and provided a color-coded map showing seven categories of well density across Kern County.

Second, response No. 0008-27 stated the driver of health risks was drilling, not ongoing production operations. Accordingly, the response stated, "the relevant inquiry is not the overall well density in any area in [Kern] County but (1) the density of wells being drilled proximate in time to each other, and (2) the density of these wells near a particular sensitive receptor such that the sensitive receptor will be exposed to the risks from drilling multiple wells over time." In other words, overall well density is not the appropriate metric for multi-well modeling when the health risk is predominately related to drilling. The response stated, the Multi-Well Health Risk Assessment did not assume a well density for operating well "but for wells being drilled at the same time or in close temporal succession." More specifically, it assumed "that forty-eight 13,000-foot wells would be drilled not only in close proximity to a single sensitive receptor but also close in time to each other in order that they would impact one individual over their lifetime living at the same location. See SREIR (October 2020), Vol. 1, at 4.3-152–155." The response asserted that this and other assumptions "are extremely conservative." The response explains that, at any given time between 2015 and 2020, there had been four to 12 drill rigs operating in Kern County and, since April 2020, that there had been only three or four.[15] The response predicted that the number was unlikely to increase in the near future, but made no attempt to correlate drilling activity to the 2,697 ministerial permits that Revised Ordinance section 19.98.040.C authorized to be issued each calendar year. The response concluded that drilling 633 wells in one location was not reasonably foreseeable because, based on the rigs present in Kern County, it would take

---

[15] Table 1 in the September 2015 updated single-well health risk assessment stated it takes "3 rigs at 1,040 HP each" drilling for 23 days to complete a 10,000-foot well and "3 rigs at 440 HP each" drilling for eight days to complete a 5,000-foot well.

98 years, which was beyond the longest period it would be reasonable to assume the same person was located at one sensitive receptor. The response also concluded that the setback distances in the SREIR's MM 4.3-5 "reduces impacts of health risk from Project activities to below [Air District] thresholds" and the Multi-Well Health Risk Assessment "demonstrates that this mitigation measure would adequately protect the public from the potential health risks due to exposure from multiple wells."

The County's response No. 0009-33 addressed the Sierra Club's comment that the setback distances in the Revised Ordinance and various mitigation measures were inadequate to protect public health. The response stated the setback distances were based on the health risk assessments and referred to response No. 0008-27's discussion of the adequacy of those assessments and resulting setback distances. Addressing clarity and enforceability, the response stated the minimum distances established by the mitigation measures "are immutable—no new well may be located within 210 feet of a sensitive receptor or within 300 feet of a school." Addressing how the distances are measured, the response stated the distances in "the air quality mitigation measures are measured from the closest edge of the well pad to the property line of the nearest sensitive receptor."

The County's response No. 00014-7 addressed the ARB's comment that health risks might be underestimated because there is a potential to drill a new well every day of the year—a comment supported by CalGEM data showing that over 2,000 notices of intent to drill were submitted to the County in 2019. The response stated that only 759 of the notices were for oil and gas production wells and, furthermore, not every well for which a permit is obtained is drilled. The response also stated that for purposes of the health risk assessments, it is the number of wells drilled proximate in time near a single sensitive receptor that matters, not the total number of wells drilled across the entire project area.

52.

## 5. *Board's Findings of Fact*

The Board's findings of fact in support of the final SREIR described various assumptions made in the Multi-Well Health Risk Assessment, including that (1) "forty-eight 13,000 foot wells would be drilled in concentric circles around a sensitive receptor, 12 at 1/8 of a mile, 12 at 1/4 of a mile, 12 at 3/4 of a mile and 12 at 1 mile";[16] (2) "all phases of the drilling occurred concurrently"; (3) "each well would have an associated mud sump with emissions"; and (4) "well re-work would occur on every well every other year." The Board found these assumptions were extremely conservative because (1) wells of 13,000 feet were considerably deeper than the average well in Kern County; (2) only 3 percent of such wells were deeper than 10,000 feet; (3) historically, between 2015 and 2020, four to 12 drill rigs were in Kern County at any given time; and (4) it would take eight rigs drilling continuously for almost a year to drill 48 wells 13,000 feet deep. Another assumption stated in the technical memorandum was that all PM10 was assumed to be toxic DPM that was inhalable even though approximately 9 percent of DPM might not be inhalable.

The Board addressed the alternative of an ordinance using a 2,500-foot setback and found the alternative would not result in less severe environmental impacts than the setbacks required by MM 4.3-5. To support this finding, the Board referred to the Multi-Well Health Risk Assessment's determination that, under conservative assumptions, the cancer risk would only be 9.3 in one million, which was well below the Air District's threshold of 20 in one million. One way of interpreting this response is that, because the identified cancer risk was not significant for purposes of CEQA, further consideration of an alternative with a lower cancer risk was not required.

---

[16] This description of the distances is inaccurate and conflicts with the technical memorandum's statement about a 300-meter fence. An eighth of a mile is 660 feet (0.125 of a mile), while 300 meters is approximately 984.25 feet (0.1864 of a mile). The County asserts it addressed the discrepancies in its responses to comments and the findings would not be altered by correcting the discrepancies.

B.    Contentions

On appeal, Sierra Club contends the Multi-Well Health Risk Assessment does not comply with CEQA because it does not analyze health risks posed by drilling allowed by the Revised Ordinance—specifically, drilling two or more wells close to a home or school. Sierra Club argues the Multi-Well Health Risk Assessment's remarkable prediction of a lower cancer risk from drilling 48 wells simultaneously than from drilling a single well is explained by the fact that the Multi-Well Health Risk Assessment only evaluated wells separated from sensitive receptors by distances much greater than allowed by the Revised Ordinance. Sierra Club restates this argument by asserting the Multi-Well Health Risk Assessment does not evaluate the nearest and most dangerous drilling allowed by the Revised Ordinance and, thus, violates CEQA by failing to identify and discuss a foreseeable and significant health risk.

The County contends the SREIR's analysis of health risks is adequate for purposes of CEQA and its findings of fact are supported by substantial evidence. The County relies on the principle that CEQA requires an EIR to study only reasonably foreseeable consequences of the project. (See *High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 125, citing *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390–391 (*Laurel Heights I*).) The County also contends a dispute over the methodology used to evaluate an environmental impact is subject to the substantial evidence test and the hypothetical assumed by Sierra Club is not supported by substantial evidence. The County characterizes Sierra Club's attack as asserting "the County must analyze … 48 wells located at the closest distance allowed by the Ordinance [citation] regardless of whether that scenario is reasonably foreseeable or likely."

Sierra Club's reply asserts the County has persisted in mischaracterizing its claim and the County's brief is devoted to knocking down a straw man. Sierra Club contends the County's failure to analyze the drilling of multiple wells at the shorter distances

54.

allowed by the Revised Ordinance is an informational defect, not a methodological choice, and the County's failure to explain the absence of an evaluation of health risks from drilling at shorter distances constitutes a separate CEQA violation.

### C. Impact Zone and Methodology

In *Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th 502, the Supreme Court stated that a public agency's "decision to use a particular methodology and reject another is amenable to substantial evidence review." (*Id*. at p. 514.) The court reframed this principle by stating "underlying factual determinations—including, for example, an agency's decision as to which methodologies to employ for analyzing an environmental effect—may warrant deference." (*Id*. at p. 516; accord, *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198.) In contrast, "whether a description of an environmental impact is insufficient because it lacks analysis or omits the magnitude of the impact is not a substantial evidence question." (*Sierra Club v. County of Fresno*, *supra*, at p. 514.)

The parties agree a choice of methodology is entitled to deferential review, but dispute whether the setback distances adopted in the Multi-Well Health Risk Assessment qualifies as a choice of methodology. They also dispute whether this case is comparable to *Sierra Watch v. County of Placer* (2021) 69 Cal.App.5th 86 (*Sierra Watch*).

#### 1. Sierra Watch

In *Sierra Watch*, the real party in interest sought the county's approval of a proposal to develop a 94-acre resort. (*Sierra Watch*, *supra*, 69 Cal.App.5th at p. 91.) The project's EIR did not consider noise impacts occurring more than 50 feet from the expected construction activity, except for impacts on a boarding school. (*Id*. at p. 106.) The school was 250 feet from the construction activity and the EIR acknowledged the school would experience noise levels up to 85 decibels and those noise levels would cause a significant impact. (*Id*. at p. 107.) The EIR did not discuss the reasons for

omitting an evaluation of other noise impacts outside the 50-foot zone. (*Id*. at p. 106.) The plaintiff's CEQA claims asserted, among other things, the EIR's analysis of the project's construction noise impacts was inadequate. (*Sierra Watch, supra,* at p. 104.) The plaintiff argued that " 'the EIR does not analyze the Project's full geographic range of noise impacts, for it ignores activities occurring farther than 50 feet from sensitive receptors.' " (*Id*. at p. 106.) The Third District agreed that the EIR's analysis was inadequate and instructed the trial court to issue a writ of mandate. (*Id*. at pp. 104, 111.)

In *Sierra Watch*, the court concluded use of a 50-foot zone was "arbitrary line drawing," which resulted in the EIR ignoring expected impacts occurring outside the area defined by the 50-foot boundary. (*Sierra Watch*, *supra*, 69 Cal.App.5th at p. 107.) Although the opinion did not state this conclusion about arbitrariness was essentially a factual determination, we regard it as such. (See *Halaco Engineering Co. v. South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 79 [whether agency's conduct is arbitrary or capricious for purposes of Gov. Code § 800 is essentially a question of fact].) The court in *Sierra Watch* gave two reasons to support its factual determination that noise impacts were expected to occur outside the 50-foot zone. First, "while the EIR would acknowledge significant impacts to a receptor sitting 50 feet from expected construction activity, it would altogether ignore potential impacts to a receptor sitting an inch more distant — even though the noise levels at these two distances would presumably be the same." (*Sierra Watch, supra,* at pp. 106–107.) Second, the EIR acknowledged that noise impacts at the boarding school, which was 200 feet beyond the 50-foot zone, would be significant. (*Id*. at p. 107.) The existence of a significant noise impact at an additional 200 feet from the 50-foot zone strongly supported the inference that other significant noise impacts could occur beyond the 50-foot zone. As a result, the court concluded the EIR should have considered potential noise impacts to other receptors over 50 feet from the project or, alternatively, explained why those impacts were excluded from the discussion. (*Ibid*.)

After setting forth the foregoing application of CEQA's principles to the facts of the case and the resulting conclusions, the court in *Sierra Watch* provided a further layer of analysis by explaining the defects in arguments made by the real party in interest. Those arguments asserted that (1) it was " 'standard' " to focus on receptors located within 50 feet of construction activity and (2) the agency's use of that distance was a methodological issue entitled to deference. (*Sierra Watch*, *supra*, 69 Cal.App.5th at p. 107.) The court rejected the use of a so-called "standard" for the simple reason that the record contained evidence of noise impacts outside the 50-foot radius. (*Ibid*.) The court also concluded an agency "cannot employ a methodological approach in a manner that entirely forecloses consideration of evidence showing … impacts to areas sitting beyond 50 feet from construction activities." (*Ibid*.) In other words, if the use of a 50-foot radius was a methodological choice, that choice was not supported by substantial evidence and, moreover, directly contradicted the evidence about noise impacts.

We interpret *Sierra Watch* as concluding the EIR's approach to the project's noise impacts resulted in two CEQA violations. First, the use of the 50-foot zone itself was a violation of CEQA because it excluded from consideration some of the project's significant noise impacts. Stated another way, substantial evidence did not support a factual finding that the construction activities would have no significant noise impacts beyond the 50-foot zone. Indeed, the evidence showed the opposite. (*Sierra Watch*, *supra*, 69 Cal.App.5th at p. 107.) Second, the EIR was inadequate as an informational document because it *did not explain* why "it declined to consider potential noise impacts" to receptors other than the boarding school that were outside the 50-foot zone. (*Ibid*.; see Guidelines, § 15121 [EIR is an informational document].) In our view, the second violation identified in *Sierra Watch* is less important *in the context of that case* because the action taken to correct the first violation most likely would remedy the EIR's informational defect—that is, a corrected EIR likely would discuss the significant noise

57.

impacts beyond the 50-foot zone and, thus, would not need to explain why those impacts were not considered.

The parties dispute whether *Sierra Watch* is analogous to the present case; they do not contend it contains legal error and, therefore, different principles should be applied here. To address the parties' dispute, we summarize the relevant precedent contained in *Sierra Watch*. First, from a broad perspective, *Sierra Watch* adopted an approach for analyzing CEQA compliance where an EIR's evaluation excludes an area or zone where there is, or might be, significant environmental impacts. We will use *Sierra Watch*'s approach as the broad framework for analyzing the "excluded zone" in this case—a term we use for the area outside the setbacks adopted in the Revised Ordinance and inside the 300-meter by 300-meter fence[17] that the Multi-Well Health Risk Assessment assumed surrounded the sensitive receptor.

As described two paragraphs earlier, the first inquiry in that broad framework is whether the agency's adoption of an excluded zone violated CEQA because it resulted in a significant environmental impact not being considered. Here, the evidence does not plainly demonstrate that there would be significant cancer risk impacts within the excluded zone. Thus, we cannot adopt the first conclusion reached in *Sierra Watch*— namely, that the EIR violated CEQA by failing to address some significant environmental impacts whose existence was plainly demonstrated by the record. Instead, we are confronted with a case where it is unclear whether it is reasonably foreseeable that activity from the project within the excluded zone would cause a significant environmental impact—specifically, a significant cancer risk over the lifetime of a sensitive receptor. Due to this lack of clarity, we must address the second inquiry in

---

**17** The County's use of the term "fence" is, for practical purposes, a euphemism or shorthand way of describing a setback distance that is larger than the 210-foot and 300-foot setbacks contained in the Revised Ordinance. When 300 meters is multiplied by 3.28084 feet per meter, the result is 984.252 feet (approximately 0.1864 of a mile).

*Sierra Watch*'s broad framework and consider whether the SREIR violates CEQA because it is inadequate as an informational document.

### 2. *Potentially Significant Effect*

The broad question of whether the SREIR adequately discussed the project's cancer risks, presents a series of more specific questions. Under our interpretation of CEQA and the case law, the initial question is whether the risk of cancer from drilling multiple wells near a sensitive receptor is a *potentially* significant effect. That question is derived from the principle that an EIR must "consider and resolve every fair argument that can be made about the possible significant environmental effects of a project." (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1109.) We interpret the quoted language as the equivalent of our Supreme Court's references to "the discussion of *potentially* significant effects in an EIR" and "the discussion of a *potentially* significant effect." (*Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th at pp. 515–516, italics added.) The latter phrase appears in the court's statement of the basic principle that "a reviewing court must determine whether the discussion of a potentially significant effect is sufficient or insufficient, i.e., whether the EIR comports with its intended function of including ' " 'detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " ' " (*Ibid*.) Deciding "whether a discussion is sufficient is not solely a matter of discerning whether there is substantial evidence to support the agency's factual conclusions. [¶] The ultimate inquiry ... is whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' [Citations.] The inquiry presents a mixed question of law and fact." (*Id*. at p. 516; see pt. I., *ante* [Standard of Review].)

59.

The question whether the cancer risk from drilling multiple wells near a sensitive receptor is *potentially* significant is easily answered. First, the SREIR and the Multi-Well Health Risk Assessment themselves have addressed the cancer risk of drilling multiple wells, which implies that the risk caused by the project has the potential to be significant. Second and most importantly, our independent review of the record has located substantial evidence to support a fair argument that the drilling of multiple wells near a sensitive receptor may have a significant environmental impact due to an increased risk of cancer. (See generally, Guidelines, § 15384, subd. (a) [term "fair argument" used in the definition of "substantial evidence"].) That substantial evidence includes, without limitation, (1) the fact that the Revised Ordinance's setback distances were based on the point from the receptor where the cancer risk from drilling a single well dropped below the 10 in one million threshold of significance; (2) the fact that the Revised Ordinance authorizes 2,697 permits to be issued annually, which relates to the potential volume of well drilling per year; and (3) the evidence of existing wells, which shows that wells can and have been located close to one another. Therefore, we conclude the cancer risk of drilling multiple wells is a potentially significant impact for purposes of CEQA that must be discussed in the EIR.

### 3. *Adequacy of the Discussion*

The SREIR and the Multi-Well Health Risk Assessment did discuss the potentially significant risk of cancer from drilling multiple wells and set forth the conclusion that the risk was not significant. Whether that discussion was legally sufficient for purposes of CEQA depends on whether the SREIR included details sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project. (*Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th at p. 516.) This presents a mixed question of law and fact. (*Ibid.*) We analyze the underlying

factual determinations under the deferential substantial evidence standard of review. (*Ibid.*)

The SREIR and the Multi-Well Health Risk Assessment evaluated the project's cancer risk for sensitive receptors by assuming sensitive receptors were located 300 meters (984.25 feet) from the nearest well being drilled, adopting other assumptions, and plugging those assumptions and other data into the models chosen (e.g., HARP2, AERMOD, and AERMAP). The 984.25-foot "fence" or setback used in the SREIR is much larger than the setbacks required by section 19.98.060.A of the Revised Ordinance, which provides that no oil or gas well shall be drilled within (1) 100 feet of any building utilized for commercial purposes, (2) 210 feet of any sensitive receptor, and (3) 300 feet from the property line of a parcel containing a school.

The failure of the SREIR and the Multi-Well Health Risk Assessment to analyze the risk for a sensitive receptor, such as a residence, where at least one of several wells was drilled near the 210-foot setback distance specified in the Revised Ordinance creates the following question: Does substantial evidence support an implied factual finding that the drilling of a single well near the 210-foot setback distance from a residence or other sensitive receptor is not reasonably foreseeable?[18]

---

[18] We assume, without deciding, that this and any other implied findings discussed below (so long as supported by substantial evidence) would justify the SREIR's failure to discuss a multiple well scenario where at least one well is drilled near the 210-foot setback. This assumption about implied findings is favorable to the County when compared to the alternative of requiring explicit findings supported by substantial evidence to support the conclusion that omitting a discussion of such a scenario would not harm the ability of the Board and the public "to understand and consider meaningfully the [cancer risk] raised by the project." (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 405; see *Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th at p. 516; Guidelines, § 15002, subd. (a)(1) [a basic purpose of CEQA: "Inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities"].) .

The terms of the Revised Ordinance demonstrate there is a *potential* for wells to be drilled about 210 feet from a sensitive receptor.  (Revised Ordinance, § 19.98.060.A.)  Therefore, we next consider whether the evidence supports a finding that drilling such a well, while possible, is not reasonably foreseeable.  (See Guidelines, §§ 15144 [forecasting], §15145 [speculation].)  In conducting our review, we located no evidence supporting the inference that drilling a well approximately 210 feet or slightly further from a sensitive receptor is not reasonably foreseeable.  Furthermore, the County has not addressed this factual question and, thus, has not referred to any evidence supporting an implied finding that drilling such a well is unforeseeable.  Therefore, on this narrow yet basic question, we conclude an implied finding that the drilling of such a well was not reasonably foreseeable lacks evidentiary support.  (Cf. *King & Gardiner*, *supra*, 45 Cal.App.5th at p. 869, fn. 23 [an implied finding by the Board was not supported by substantial evidence].)  As a result, we reject the existence of such an implied finding.

Having addressed the drilling of a single well within the excluded zone and near the 210-foot setback distance from a sensitive receptor, we next consider the drilling of additional wells that might impact the same receptor.  Again, we frame the issue as whether substantial evidence supports an implied factual finding that it is not reasonably foreseeable that additional wells would be drilled near a sensitive receptor with a well drilled just outside its setback distance.

As before, we have not located substantial evidence supporting an implied finding that it is unforeseeable that additional wells could be drilled near a sensitive receptor that has had a well drilled just outside the setback distance.  The County's appellate briefing has not addressed this specific question and, thus, has not cited any evidence on point.

In contrast, the scenario evaluated in the SREIR and the Multi-Well Health Risk Assessment assumes wells are drilled near one another.  Figure 1 in Dr. H. Andrew Gray's September 15, 2020 memorandum illustrates the scenarios' use of four rings of wells centered around sensitive receptors.

62.

In Figure 1 of the memorandum, orange dots represent each of the 48 wells located on the concentric rings. On both the first (inner) and second rings, two wells are positioned near one another in the twelve o'clock, three o'clock, six o'clock and nine o'clock locations, with one additional well positioned on each ring midway between the four pairs of wells. Thus, the two innermost rings contain 12 wells each. Gray's memorandum states that the wells on the first ring are located from 0.18 to 0.22 miles from the centrally located receptors and the second ring wells are located from 0.31 to 0.34 miles from the receptors. Therefore, the distance between the wells at the 12 o'clock position on the first and second rings is approximately 0.13 miles or 684.4 feet. Thus, if a sensitive receptor were located 210 feet above (presumably north of) the 2 wells on the first ring's 12 o'clock position, the receptor would be roughly 474 feet from the two wells in the 12 o'clock position on the second ring. Consequently, the Multi-Well Health Risk Assessment's configuration of multiple wells relatively close together suggests it is reasonably foreseeable that additional wells could be drilled near a sensitive receptor that has had a well drilled just outside the applicable setback distance.

Consequently, we conclude substantial evidence does not support an implied factual finding that it is not reasonably foreseeable that additional wells could be drilled near a sensitive receptor that has had a well drilled just outside the setback distance.

Next, because the SREIR addresses the timing of the drilling of multiple wells, we examine when those wells might be drilled. In particular, we consider whether the drilling would be close enough in time that the additional wells would impact one individual over his or her lifetime living at the same location—that is, a location where a first well was drilled just outside the setback distance. This reference to wells being drilled "close in time" is taken from the Board's discussion of the Multi-Well Health Risk Assessment's assumption about multiple wells "drilled not only in close proximity to a single sensitive receptor but also *close in time* to each other in order that they would impact one individual over their lifetime living at the same location." (Italics added.)

63.

The Board also referred to sensitive receptor "exposed to the risks from drilling multiple wells over time."

The Multi-Well Health Risk Assessment made the conservative assumption that the wells would be drilled simultaneously, and stated it was unlikely to actually happen due to the large project area where wells might be drilled and the small number of drilling rigs operating in Kern County. However, the four to 12 drilling rigs reported to be active in Kern County does not preclude the drilling of the wells sequentially or at least close enough in time to impact one individual over his or her lifetime of living at that location. Consequently, we conclude the size of the project area and number of active drilling rigs is not sufficient by itself to support an implied finding that the drilling of additional wells near a sensitive receptor close in time to the drilling of a well just outside the applicable setback distance is not reasonably foreseeable.

Having eliminated the implied factual findings discussed above, we turn to the legal side of the mixed question of whether the SREIR's discussion of cancer risks was sufficient or insufficient. The adequacy of the SREIR as an informational document depends upon whether that document serves its intended function of including sufficient detail to enable those who did not participate in its preparation to understand and consider meaningfully the issues raised by the project. (*Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th at p. 516.) In particular, we address whether the final SREIR provided a sufficient explanation of the Multi-Well Health Risk Assessment's assumption that the sensitive receptors were surrounded by a 984.25-foot by 984.25-foot "fence" (i.e., setback).

The final SREIR included a technical memorandum dated October 2020 that acknowledged the assumption "that the sensitive receptor had a 300m x 300m (or approximately 1,000 foot fence around it)." While acknowledging its use, the technical memorandum does not explain why the 984.25-foot (300 meter) setback distance was chosen and, moreover, does not acknowledge that the assumption created an excluded

zone when compared to the actual setback distances of 100, 210 and 300 feet adopted in the Revised Ordinance.  We conclude the failure to explain why a 984.25-foot setback was assumed in the Multi-Well Health Risk Assessment when the setbacks in the Revised Ordinance were much smaller rendered the SREIR's discussion  insufficient for purposes of CEQA because it precluded a meaningful understanding of the cancer risks created by the setbacks actually adopted.

In reaching the conclusion that the SREIR did not provide an adequate discussion of the project's cancer risk, we have considered whether the scenario of 48 simultaneously drilled wells used in the Multi-Well Health Risk Assessment is an appropriate substitute for an analysis that, in contrast, does not create an excluded zone over an eighth of a mile wide.[19]  We conclude the information provided does not allow the public or decision makers reading the SREIR to meaningfully understand how the analysis of a scenario with the excluded zone is a logical substitute to an analysis without an excluded zone.  Perhaps the conservative assumptions about other factors offset the reduction in cancer risk resulting from the overly large setback distance of 984.25 feet.  But, maybe not.  The critical point is that, someone reading the SREIR would not develop a meaningful understanding of the cancer risk resulting from a well being drilled just outside the 210-foot setback and other reasonably foreseeable wells drilled nearby.  The repeated statements about conservative assumptions on other parameters do not rationally explain why the unrealistically large setback distance of 984.25 feet and the resulting creation of an excluded zone was appropriate or, alternatively, was harmless error.

In *Sierra Watch*, *supra*, 69 Cal.App.5th 86, the court was able to determine "the EIR fell short with this arbitrary line drawing."  (*Id*. at p. 107.)  Here, we lack sufficient information to go that far.  But, from the opposite point of view, we also lack sufficient

---

[19]    984.25 feet minus 210 feet is 664.25 feet, which is more than 660 feet (i.e., 5,280 feet per mile divided by eight).

information to determine that the line drawn 984.25 feet from a sensitive receptor was not arbitrary in light of the setback distances set forth in the Revised Ordinance. The lack of information for the latter determination means the SREIR contains an informational defect that must be corrected on remand. (See § 21005, subd. (a) [noncompliance with the information disclosure provisions of CEQA may constitute a prejudicial error].)

We recognize that in *Sierra Watch*, *supra*, 69 Cal.App.5th 86, the court's discussion of noise impacts addressed the issue from two perspectives. The first addressed whether the EIR's noise impact discussion complied with CEQA. That discussion was sufficient to fulfill the court's constitutional obligation to provide a decision "in writing with reasons stated." (Cal. Const., art. VI, § 14.) The second separately addressed arguments raised by the real party in interest and explained why those arguments were unconvincing. (*Sierra Watch, supra,* at p. 107.) Here, we do not address the County's arguments in the detail provided in *Sierra Watch* because we agree with Sierra Club that the County has advanced a straw man argument by stating Sierra Club's attack is based on the premise "that the County must analyze a theoretical worst-case scenario—*i.e.*, 48 wells located at the closest distance allowed by the Ordinance [citation] regardless of whether that scenario is reasonably foreseeable or likely." Sierra Club's papers clearly show that extreme scenario is not the foundation for its claims of error.

Finally, we note that we are unable, as a court of review, to suggest the parameters or assumptions that should be plugged into the models in connection with another multi-well analysis prepared for the County after remand. Based on the standard adopted by our Supreme Court, we can reiterate that, among other things, the use of a setback distance in the models that is greater than the setback distances in the Revised Ordinance should be explained to enable members of the public "to understand and to consider meaningfully the issues raised by the proposed project." (*Laurel Heights I*, *supra*, 47 Cal.3d at p. 405; *Sierra Club v. County of Fresno*, *supra*, 6 Cal.5th at p. 516.)

66.

V.    WATER SUPPLY IMPACTS*

The parties dispute whether the SREIR's analysis of water supply impacts and related mitigation measures complies with CEQA.  In particular, Sierra Club contends the County failed to adequately analyze localized water supply conditions and impacts and unlawfully rejected proposed mitigation measures when it removed MM 4.17-5 based on a legal error involving social and economic impacts.

A.    Background

1.    Water Code Provisions

Context for the parties' dispute about the proper analysis of water supply impacts and related mitigation measures is established by various provisions in the Water Code addressing groundwater.  These provisions are part of the "Regulatory Setting" addressed in section 4.9.3 of the SREIR.

The Legislature has stated an established policy of California is "that every human being has the right to safe, clean, affordable and accessible water adequate for human consumption, cooking, and sanitary purposes."  (Wat. Code, § 106.3, subd. (a); Stats. 2012, ch. 524 § 1.)

In 2009, the Legislature amended the Water Code to require the Department of Water Resources (DWR) to implement a California statewide groundwater elevation monitoring (CASGEM) program.  (Stats. 2009-2010, 7th Ex.Sess., ch. 1, § 1; see Wat. Code, §§ 10920–10936.)  The Legislature intended "that on or before January 1, 2012, groundwater elevations in all groundwater basins and subbasins be regularly and systematically monitored locally and that the resulting groundwater information be made readily and widely available."  (Wat. Code, § 10920, subd. (a).)  The SREIR stated that the CASGEM program collects data on groundwater levels and use for 515 designated

---

\*    See footnote, *ante*, page 1.

basins in the state, including the Kern County subbasin that underlies most of the project area.

In 2014, the Legislature adopted the Sustainable Groundwater Management Act (SGMA; Wat. Code, § 10720 et seq.) to provide for sustainable management of groundwater basins, to enhance local management of groundwater consistent with the rights to use and store groundwater, to preserve the security of water rights to the greatest extent possible consistent with sustainable management of groundwater, to provide local groundwater agencies with the authority and assistance necessary to sustainably manage groundwater, to avoid or minimize subsidence, to improve data collection and understanding of groundwater, to increase groundwater storage, and to remove impediments to recharge.  (Wat. Code, § 10720.1.)  SMGA "will not be fully implemented for several years, allowing groundwater overdraft to continue in some regions."  (Wat. Code, former § 13807, subd. (b).)  The SREIR states that to achieve its objectives, the SGMA empowers local agencies to form groundwater sustainability agencies (GSA's) to manage basins and requires the GSA's to adopt groundwater sustainability plans (GSP's).

SMGA required the Kern County subbasin to be managed under a GSP, or a coordinated set of plans, by January 31, 2020, because the subbasin had been designated as high or medium priority under the CASGEM program and was subject to critical overdraft conditions.  (*King & Gardiner*, *supra*, 45 Cal.App.5th at p. 840–841.)[20]  The Kern County subbasin is being managed under a coordination agreement among 11 GSA's implementing five GSP's and 15 management area plans to attain SGMA's goals

---

[20]  In 2017, the Legislature added Water Code former sections 13807 through 13808.8 to address new wells in critically overdrafted groundwater basins, which includes the project area.  (Stats. 2017, ch. 538, § 1, pp. 4053–4055.)  Among other things, the legislation (1) required applicants for new wells in such basins to include information about the proposed well in their permit applications and (2) made that information available to the public and GSA's.  (Wat. Code, former §§ 13808, 13808.2.)

by 2040. These plans are based on adaptive management principles and, the SREIR states it is virtually certain that the nature and extent of SGMA projects used in the project area will be modified significantly during the five-year reviews of the plans, during the 20-year SGMA compliance period, and during SGMA's 50-year planning and implementation horizon.

### 2. *2020 Opinion*

In *King & Gardiner*, *supra*, 45 Cal.App.5th 814, Lions Farming contended CEQA required the EIR to analyze water supply impacts to the extent reasonably possible and the EIR failed to meet this standard because it only analyzed water supply impacts at a regional level and, without adequate justification, disregarded local impacts. (*Id*. at p. 838.) The County responded by arguing the EIR met the applicable standard by performing a detailed, systematic analysis of water supply impacts within three separate subareas using the best available data. The County argued a more localized analysis was not required by CEQA because of (1) the technical challenges in using more geographically specific area and (2) the many uncertainties in forecasting long term use at the local level, some of which stemmed from how SMGA, which was new, would be implemented.

In the 2020 opinion, we concluded (1) the EIR, at the time it was circulated, did not violate CEQA's requirement for an analysis of water supply impacts *to the extent reasonably possible*; (2) the EIR's discussion of mitigation measures for the project's significant impacts to water supplies was inadequate; and (3) the analysis of water supply in a revised EIR must be brought up to date. (*King & Gardiner*, *supra*, 45 Cal.App.5th at pp. 845–846 and fn. 15.) We also stated: "Whether the updated information will warrant an analysis of impact[s] to water supplies at a level other than the subareas used in the original EIR is a question that must be decided in the first instance by the County in its role as lead agency." (*Id*. at p. 846, fn. 15.)

69.

### 3. October 2020 Draft SREIR

The draft SREIR of October 2020 stated that (1) the demand for municipal and industrial (M&I) water from oil and gas activity was projected to increase about 2,982 acre-feet per year (AFY) from 2012 to 2035; (2) there is no surplus M&I water in the project area; (3) new uses of M&I water would increase the regional groundwater shortfall if supplied by groundwater extraction; and (4) increasing M&I water demand under overdraft conditions would contribute to a significant cumulative water supply impact in the project area. It also stated it was not feasible to implement mitigation measures (1) directly curtailing oil and gas activities to reduce water demand or (2) indirectly curtailing other activities (such as agriculture) to reduce water demand.

On the subject of groundwater supplies, the draft SREIR stated that such "supplies exist in specific basins." It also stated that such supplies do not exist in localized pockets of subbasins where a local water district controls all the water. As a result, the draft SREIR concluded that the three subareas it adopted for other purposes were appropriate for analyzing groundwater supply. It also stated the Kern County subbasin that underlies most of the project area has been designated by the DWR as high-priority and critically overdrafted.

The draft SREIR noted that, under SGMA, GSA's in the project area are the exclusive local agencies for implementing SGMA in accordance with duly adopted GSP's and management area plans. It also stated (1) most GSP's and management area plans include water supply and demand projections over a 50-year planning and implementation horizon and (2) none of the adopted GSP's or management area plans within the project area identify oil and gas operations as a significant factor affecting the achievement of the SGMA objectives. Based on this and other aspects of the plans, the SREIR stated the review of the plans did not provide any new information indicating the water supply or other SGMA-related impacts, including water quality, would be greater in magnitude or scope than previously considered.

70.

Among the mitigation measures discussed in the draft SREIR was the possibility that "produced water" from oil and gas activities could be used elsewhere and, thus, would have a positive impact on the water supply. "Produced water is groundwater that naturally occurs in oil and gas reservoirs, is brought to the surface with the extracted oil and gas, and is separated from the hydrocarbons after extraction." (*King & Gardiner*, *supra*, 45 Cal.App.5th at p. 840.) Produced water usually is poor quality water unsuited for agricultural, residential, commercial or industrial uses without substantial treatment to remove contaminants. (*Ibid.*) The draft SREIR concluded that, based on current technological and economic restraints, the available evidence did not show that produced water would continue to be utilized or that expanded produced water reuse would occur in the project area in predictable volumes over time. Thus, a mitigation measure requiring additional use of produced water was rejected as infeasible.

The draft SREIR included three mitigation measures addressing groundwater supply. MM 4.17-3 provides that permit applicants may use groundwater only from wells equipped with a water meter and requires permit applications to include estimates of the source and use of groundwater along with the source and estimated use of reclaimed water. The County will compile the water use information, post it online each year, and send a copy to all GSA's and the Kern County Water Agency.

MM 4.17-4 applies to oil and gas activities that fall outside the Revised Ordinance's streamlined permitting process and, thus, require conditional use permits. It provides: "Public Notices of all Conditional Use Permits for oil and gas activities shall be sent to appropriate Water Districts, Groundwater Authorities, and the Kern County Water Agency for review and comment on water availability and usage."

MM 4.17-5 required permit applicants to pay a fee of $50 or $250 per well, depending on whether they are subject to minor activity review or oil and gas conformity review. The fees were to be deposited into a grant fund to be implemented and administered by Kern County Public Health. The grants were to be available for projects

71.

in disadvantaged communities in the valley portion of Kern County that involved the design, permitting, and construction of physical improvements to water wells or water systems serving an identified disadvantaged community.

The draft SREIR noted that Water Code section 10723.2 requires GSA's to consider the interests of all beneficial uses and users of groundwater in developing and implementing GSP's and management area plans. The statutory list of such users includes domestic well owners, municipal well operators, public water systems, disadvantaged communities, and others. (Wat. Code, § 10723.2, subds. (a)(2), (b), (c), (i).) Disadvantaged communities include, but are not limited to, "those served by private domestic wells or small community water systems." (Wat. Code, § 10723.2, subd. (i).)[21] Despite SGMA's requirement that the interests of all beneficial users be considered, the draft SREIR stated there was substantial evidence that disadvantaged communities' interest in groundwater supplies had not been sufficiently considered in the development and implementation of GSA's and management area plans. The draft SREIR concluded that project M&I water use would contribute to a cumulatively significant impact on disadvantaged communities that use groundwater but are not adequately considered in the plans adopted under SGMA in the project area. It stated the funds collected under MM 4.17-5 would mitigate the project's fair share of cumulative impacts to disadvantaged communities that are insufficiently considered in the existing SGMA process.

---

[21]     Section 21080.47, subdivision (a)(2) states: " 'Disadvantaged community' means a community with an annual median household income that is less than 80 percent of the statewide annual median household income." Section 21080.47 provides an exemption from CEQA requirements for projects consisting solely of the installation, repair, or reconstruction of water infrastructure that primarily benefits a small disadvantaged community water system or a state small water system. (Legis. Counsel's Dig., Sen. Bill No. 974, (2019–2020 Reg. Sess.).

### 4. Comments, Reponses and Briefing

Sierra Club's September 2020 comment letter asserted the draft SREIR's analysis of water supply mitigation measures did not comply with CEQA. Sierra Club contended the County (1) improperly relied on SGMA to relieve itself of the duty under CEQA to mitigate impacts; (2) failed to consider the obvious mitigation measure of limited oil and gas drilling or provide any evidence for finding measures that reduced drilling were infeasible; and (3) ignored many potential mitigation measures that were feasible and easily accessible. These other mitigation measures included water demand reduction measures outside the oil and gas industry, such as land purchases and incentive programs to fallow land or convert to less water-demanding crops. Sierra Club argued demand-reduction measures were within the County's power and would ameliorate some of the project's most harmful and inequitable water supply impacts, such as contributing to domestic wells in disadvantaged communities going dry.

In January 2021, the County released its responses to the comments. Among other things, the County stated that the SREIR provided a thorough analysis of potential water supply mitigation measures, provided substantial evidence supporting findings that certain measures could not be feasibly implemented or would not predictably reduce water supply impacts, and required three water supply mitigation measures to be implemented. The responses and other revisions to the draft SREIR are part of the final SREIR.

In March 2021, Sierra Club sent a letter to the Board asserting the final SREIR contained legal flaws and the proposed findings of fact and statement of overriding considerations were legally inadequate. Addressing water supply impacts, the letter stated the County had not adopted or adequately considered feasible mitigation measures. In particular, Sierra Club asserted (1) MM 4.17-5 was an unlawful fair-share fee, (2) the SREIR failed to adequately describe the cumulative water supply impacts on

73.

disadvantaged communities, and (3) the SREIR failed to adequately describe the water supply baseline in disadvantaged communities.

At a September 2021 case management conference, the superior court set forth a briefing schedule for the challenges to the final SREIR. In November 2021, Sierra Club filed an opening brief asserting the challenges raised in its March 2021 letter. The County's opposition asserted, among other things, that the SREIR provided valuable mitigation of impacts unique to disadvantaged communities even though CEQA does not require a separate analysis of effects on minority, low-income, or disadvantaged communities. The County describes the SREIR's discussion of water supply impacts on disadvantaged communities as its voluntary (i.e., not required by CEQA) consideration of a social effect and any defects in its voluntary discussion could not constitute prejudicial error.

### 5. Superior Court's Ruling

The superior court's June 7, 2022, ruling on the petitions for a third writ of mandate addressed the adequacy of the SREIR's analysis and mitigation of water supply impacts. The court considered the arguments concerning impacts to disadvantaged communities, concluded the SREIR's analysis failed to comply with CEQA, and explained: "While the County is correct that there is no requirement in CEQA to perform an analysis of impacts to low-income or disadvantaged communities, once the County committed to the analysis and imposed a mitigation fee to fund improvements to drinking water wells or systems that serve [disadvantaged communities], it had an obligation to make sure that its analysis and findings complied with the requirements of CEQA." The court concluded that the SREIR violated CEQA by disclosing nothing about baseline water supply conditions in disadvantaged communities and disclosing nothing about the nature or magnitude of impacts to disadvantaged communities. One of the issues addressed in this appeal is whether, in the context of this case, the statement that "there is

74.

no requirement in CEQA to perform an analysis of impacts to low-income or disadvantaged communities" is an accurate statement of law.

### 6. August 2022 Addendum to the SREIR

After receiving the superior court's ruling, the County decided to delete MM 4.17-5. The August 2022 addendum to the SREIR stated MM 4.17-5 had been "included in the SREIR based on analysis of potential impacts to disadvantaged community water supplies." The measure imposed a fee ($50 or $250) on permit applicants that would be used "to fund assistance for water supplies, including bottled water and water well or water system improvements serving disadvantaged communities in the Valley portion of the County." The addendum explained the County's decision to delete MM 4.17-5 by stating that "there is no requirement in CEQA to perform an analysis or provide mitigation for impacts to low-income or disadvantaged communities (see, e.g., Court Ruling at 19). The Board … proposes to delete MM 4.17-5 from the SREIR and the MMRP to comply with the Court Ruling and CEQA." In place of MM 4.17-5, the Board approved the Voluntary Disadvantaged Community Drinking Water Grant Fund Pilot Program that would be funded by voluntary, nonrefundable contributions from permit applicants.

### 7. Discharge Order

In November 2022, the superior court issued an order discharging the Third Writ. The order did not mention the August 2022 addendum or the objections made to its use, but the order's general finding that the County had satisfied the Third Writ in all respects implies the court determined the addendum and the removal of MM 4.17-5 complied with CEQA.

### B. Environmental Impact or Socioeconomic Change

The first water supply issue we address is raised by Sierra Club's argument that the County's justification for eliminating MM 4.17-5 an erroneous insistence that water

75.

supply impacts in disadvantaged communities were not environmental impacts and, thus, did not need to be analyzed or mitigated to comply with CEQA. In response, the County recognizes that "water supply impacts to Project area residents as a whole are impacts cognizable under CEQA" and contends the superior court "correctly confirmed 'there is no requirement in CEQA to perform an analysis of impacts to low-income or disadvantaged communities.' " The County reiterates the argument that its initial decision to discuss disadvantaged communities did not create a new obligation under CEQA and any defect in that discussion could not be prejudicial error.

The issue presented by the County's approach to water supply impacts experienced by disadvantaged communities can be restated broadly as whether the County abused its discretion by failing to "proceed[] in a manner required by law." (§ 21168.5.) Whether the County followed applicable law is a question subject to independent judicial review. (*King & Gardiner*, *supra*, 45 Cal.App.5th at p. 838.) Our independent review begins with an overview of the provisions in CEQA and the Guidelines defining environmental impacts and the role of social and economic impacts.

1. *CEQA's Approach to Economic and Social Changes*

CEQA was designed to provide long term protection to the environment. (*Mountain Lion Foundation v. Fish & Game Com.*, *supra*, 16 Cal.4th at p. 112.) CEQA defines the "environment" as the physical conditions that exist in the project area. (§ 21060.5.) " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in the environment." (§ 21068.) Economic and social changes usually do not alter the physical conditions constituting the environment and, thus, do not qualify as significant effects on the environment. (*Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1019.) Accordingly, CEQA's definition of substantial evidence relevant to whether a project might cause a significant effect on the environment expressly excludes "evidence of social or economic impacts that do not

76.

contribute to, or are not caused by, physical impacts on the environment." (§ 21080, subd. (e)(2); see Guidelines, §§ 15064, subd. (f)(6) & 15384, subd. (a) [definition of substantial evidence].) Eliminating the double negative from the definition produces the statement that substantial evidence may include "evidence of social or economic impacts that … contribute to, or are … caused by[] physical impacts on the environment." (§ 21080, subd. (e)(2).)

The use of the disjunctive "or" in this statement indicates there are two situations in which social or economic impacts are relevant evidence for purposes of CEQA. Those situations are described in the second and third principles set forth in Guidelines section 15064, subdivision (e). The first principle, which reflects CEQA's definitions and case law, provides that "[e]conomic and social changes resulting from a project shall not be treated as significant effects on the environment." (Guidelines, § 15064, subd. (e); *County of Butte v. Dept. of Water Resources* (2023) 90 Cal.App.5th 147, 174 ["an economic effect in itself is not a significant effect on the environment"].) For example, the claim by neighboring landowners that a proposed project could adversely affect their property values involves an economic impact that is not recognized as an environmental impact under CEQA. (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 903.)

The second principle provides that, "[w]here a *physical change* is caused by economic or social effects of a project, the *physical change* may be regarded as a significant effect in the same manner as any other *physical change* resulting from the project." (Guidelines, § 15064, subd. (e), italics added; e.g., *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 170–171 [county required to consider whether proposed regional shopping center would put downtown stores out of business and cause physical deterioration of the downtown area].) In such a situation, the economic or social impact is an intermediate link in the chain of events causing an environmental impact. (See *Make UC A Good Neighbor v.*

77.

*Regents of University of California* (2023) 88 Cal.App.5th 656, 693.)  In the present case, there is no claim that changes to the physical environment will be caused by the economic or social effects resulting from the project causing lower levels of groundwater in disadvantaged communities or elsewhere.

The third principle, which applies in this appeal, provides that "economic and social effects of a physical change may be used to determine that the physical change is a significant effect on the environment."  (Guidelines, § 15064, subd. (e).)  Thus, adverse economic or social effects on people may be used as a factor in determining whether the physical change that caused the economic or social changes is *significant*.  (*Ibid*.; Guidelines, § 15382.)  "For example, if a project would cause overcrowding of a public facility and the overcrowding causes an adverse effect on people, the overcrowding would be regarded as a significant effect."  (Guidelines, § 15064, subd. (e).)

###### 2.    *Application of Principles*

There are four basic steps in our analysis of the project's impact on groundwater supply and the significance of that impact.  First, the use of groundwater in the project area contributes to the lowering of the groundwater levels.  Therefore, the project's oil and gas activities that use groundwater will contribute to lower groundwater levels in the project area.  This lowering of groundwater levels qualifies as a change in "the physical conditions which exist in the project area" and, therefore, is a change in the "environment."  (§ 21060.5)

Second, simply saying that groundwater levels will be lowered in the project area does not fully describe the environmental impact because there also will be a physical impact on groundwater wells in the project area.  The lowering of the water level in such wells qualifies as a change in the environment for purposes of CEQA because the definition of " 'environment' includes both natural and man-made conditions."  (Guidelines, § 15360.)   Groundwater wells are a man-made condition and, therefore,

78.

they are part of the environment protected by CEQA. Thus, a proper analysis of the project's environmental impacts includes the more specific impact of lower water levels in groundwater wells. (See *Gray v. County of Madera* (2008) 167 Cal.App.4th 1099, 1112 [decline in water levels in private wells adjacent to proposed quarry project a potentially significant impact] (*Gray*).)

Third, lower water levels in groundwater wells might physically impact the people and communities that rely on those wells for water. We use the word "might" because of the following possibilities. First, where a well is deep relative to the groundwater level and there is plenty of water available for existing uses, there would be no discernable immediate physical impact on the users. Second, where a well is not deep relative to the groundwater level, the lower groundwater level might reduce the amount of water available for use to the point where those who rely on the well do not have enough available well water for existing uses. (See *Gray*, *supra*, 167 Cal.App.4th at p. 1112 [decline in pumping rates in adjacent private wells a potentially significant impact].) Such groundwater wells could be referred to as partially or fully dewatered. Thus, the third step seeks to distinguish between the two possibilities and identify where lower water levels in groundwater wells has "effects on human beings, either directly or indirectly." (§ 21083, subd. (b)(3).) For example, the lower groundwater levels in the wells could have effects on human beings because they would have to obtain water from a different source, reduce usage, or a combination of the two. Thus, the third step looks beyond the impact on the well itself and considers whether the lowering of the water level in the well impacts the human beings who use the well.

Fourth, with the impacts on groundwater levels, groundwater wells, and human beings identified, the lead agency is required to find whether or not those impacts qualify as a " 'significant effect on the environment' " for purposes of CEQA. (§ 21083, subd. (b).) This inquiry into significance includes determining whether the direct or indirect impacts on human beings are "adverse" and "substantial." (§ 21083, subd. (b)(3).)

Appendix G of the Guidelines mandates a finding in response to the issue: "Does the project have environmental effects which will cause substantial adverse effects on human beings, either directly or indirectly?" (Guidelines, Appendix G, XXI, subd. (c).) The answers listed in the appendix are (1) potentially significant impact, (2) less than significant with mitigation incorporated, (3) less that significant impact, and (4) no impact. (*Ibid*.) As described in part V.B.1., *ante*, the determination of whether an environmental impact is significant takes into account the social and economic impacts caused by that environmental impact. Because the social and economic effects of the physical impact of having less groundwater available may vary from area to area or community to community based on socioeconomic conditions, it necessarily follows that the severity (i.e., degree of significance) of a reduction in available well water also may vary from area to area or community to community even where the physical reduction in available water per person is essentially the same. It also follows that a particular mitigation measure might be more effective at reducing the significance of the environmental impact in some communities where the significance or severity is greater than in communities where the significance of a similar or nearly equivalent environmental impact is less severe.

Based on the foregoing, we conclude the superior court's statement that "there is no requirement in CEQA to perform an analysis of impacts to low-income or disadvantaged communities" contains legal error. Physical impacts to groundwater levels and the related physical impact of dewatering of groundwater wells cannot be ignored simply because some or all of those environmental impacts occur in low-income or disadvantaged communities. Furthermore, the analysis of the significance of the environmental impact of dewatering wells across the entire range of affected communities that rely on such wells should not exclude social or economic factors because those factors are relevant to determining the significance of the physical impact. As a result, the significance of the physical impact may vary from community to

80.

community because of social or economic impacts experienced by a particular community. (Guidelines, § 15064, subd. (e) [adverse economic or social effects on people are relevant to determining whether a physical change is significant].)

Accordingly, the County failed to "proceed[] in a manner required by law" (§ 21168.5) when it decided to delete MM 4.17-5 on the ground that "there is no requirement in CEQA to perform an analysis or provide mitigation for impacts to low-income or disadvantaged communities." Similarly, on appeal, the County argues that CEQA does not require an analysis unique to a particular socioeconomic class. This argument is inaccurate to the extent it contradicts the principle that social and economic effects play a role in determining the significance of an environmental impact (see Guidelines, § 15064, subd. (e)) and the significance of an environmental impact may be greater to human beings who experience adverse social or economic effects.

The administrative record contains substantial evidence supporting a fair argument that groundwater wells in the project area have been and continue to be at risk for dewatering and, therefore, will be impacted by the project's contribution to a cumulative impact. Therefore, any subsequent EIR seeking to correct the defects in the SREIR should address that evidence along with Sierra Club's argument that information about baseline water supply conditions in disadvantaged communities and the nature or magnitude of the impacts to those communities is readily available. However, in accordance with the principles described above, an analysis of localized impacts on groundwater wells should not be limited to disadvantaged communities. Instead, the communities' socioeconomic status should be taken into account only when determining the significance of the physical impact or identifying mitigation measures to lessen the significance. To the extent that such an analysis is limited by available evidence, the County should explain those limitations and why the discussion it provides has analyzed the issues of physical impact and significance (which includes social and economic

81.

impacts) " 'to the extent reasonably possible.' " (*King & Gardiner*, *supra*, 45 Cal.App.5th at p. 843.)

C.      Fee Payment as a Mitigation Measure

Sierra Club contends the County violated CEQA by rejecting proposed water supply mitigation measures. In particular, it argues the County removed MM 4.17-5 based on an erroneous legal determination and the County's reasons for declining to pay GSA's a fair-share fee are legally erroneous. In response, the County argues (1) it properly removed MM 4.17-5, (2) CEQA and case law do not require fee payments to other agencies with exclusive responsibility for funding and undertaking actions, and (3) CEQA does not require fee payments to other agencies if such fees will not result in actual mitigation.

1.      *Removal of MM 4.17-5*

The removal of MM 4.17-5 was justified, in the County's view, because "impacts particular to a socioeconomic class are not cognizable under CEQA" and the measure, as explained in the County's revised findings, "went beyond CEQA's requirements by attempting to address a socioeconomic impact." The County also asserts that it "concluded there was no feasible way to assess impacts to a particular socioeconomic group."

First, as described in part V.B., *ante*, the County's argument that impacts to a socioeconomic class are not cognizable under CEQA is off point. The applicable rule of law provides that social and economic effects are relevant to determining the significance of a change in physical conditions (i.e., an environmental impact), such as the lowering of groundwater levels in wells.

Second, the contention that MM 4.17-5 went beyond CEQA's requirements by attempting to address a socioeconomic impact also misapplies the principles established by CEQA and the Guidelines for addressing social and economic effects. The proper

characterization of MM 4.17-5 is that it attempted to reduce the significance of the cumulative impact to which the project will contribute. An attempt to reduce the significance of an environmental impact by reducing the social or economic effects caused by the environmental impact is distinguishable under CEQA from attempting to reduce social or economic impacts that are not caused by the project's effects on the environment. This distinction is overlooked, rather than acknowledged, by the County's arguments.

Third, the County's references to the record do not establish that its decisionmaker, the Board, actually found or concluded there was no feasible way to access impacts to a particular socioeconomic group. More importantly, this contention (like the first two reasons for removing MM 4.17-5) is based on a skewed view of CEQA's principles for addressing social and economic effects in determining the significance of the lowering of groundwater levels in wells. This legal error undermines any purported finding of infeasibility.

Consequently, the County's rationale for removing MM 4.17-5 do not comply with CEQA and, therefore, constitutes an abuse of discretion for purposes of section 21168.5.

### 2. Fee Payment Program

Under section 21081, subdivision (a)(2), a lead agency is not required to undertake mitigation measures if the agency finds that the measures "are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency." A finding disclaiming the responsibility to mitigate significant "environmental effects is permissible only when the other agency said to have responsibility has *exclusive* responsibility." (*City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341, 366 (*Marina*); see Guidelines, § 15091, subd. (c).)

Here, the County contends CEQA does not require it to impose a fair-share fee on permit applicants because the GSA's have exclusive responsibility for mitigating the environmental effects of declining groundwater levels. To support this contention, the County cites Water Code sections 10723.8, subdivision (d) and 10730.2. Under these provisions, the County asserts that "there is no question that the GSAs have independent authority to pursue a fair-share fee if one is deemed necessary to implement SGMA." As explained below, we agree GSA's have the authority to impose fair-share fees, but conclude that authority is not an exclusive responsibility.

Our analysis of the Water Code provisions and whether GSA's have exclusive responsibility for purposes of section 21081, subdivision (a)(2), begins with the definition of a GSA because that definition mentions fees. Water Code section 10721, subdivision (j) states:

> " 'Groundwater sustainability agency' means one or more local agencies that implement the provisions of this part. For purposes of *imposing fees* pursuant to Chapter 8 (commencing with Section 10730) or taking action to enforce a groundwater sustainability plan, "groundwater sustainability agency" also means each local agency comprising the groundwater sustainability agency if the plan authorizes separate agency action." (Italics added.)

Water Code section 10723.8, subdivision (a) provides that when a local agency or combination of local agencies decide to form a GSA, it shall notify the DWR "of its decision and its intent to undertake sustainable groundwater management." Subdivision (d) of that section provides that "after the decision to be a groundwater sustainability agency takes effect, the groundwater sustainability agency *shall be presumed to be the exclusive* sustainability agency within the area … described in the notice." (Wat. Code, § 10723.8, subd. (d), italics added.) This provision identifies the entity that is the one and only GSA for a particular area, but it does not identify what actions are exclusively the responsibility of a GSA.

84.

The powers and authorities of a GSA are set forth in a Water Code chapter containing sections 10725 through 10726.9. The County has not cited any of these sections in support of its argument that GSA's have exclusive authority over the imposition of fair-share fees. We have located nothing within those sections stating that fair-share fees are the exclusive province of GSA's or, alternatively, that other governmental entities are precluded from requiring a fair-share fee to be paid to the GSA. We note that Water Code section 10726.8, subdivision (f) provides: "Nothing in this chapter or a groundwater sustainability plan shall be interpreted as superseding the land use authority of cities and counties, including the city or county general plan, within the overlying basin." This provision does not support the view that SGMA placed exclusive responsibility for imposing fair-share fees on the GSA and took any such authority away from counties. Therefore, we conclude Water Code sections 10725 through 10726.9 do not grant GSA's exclusive authority for fair-share fees related to groundwater use.

Next, we consider the provision in SGMA that addresses the authority of a GSA to impose fees. Water Code section 10730, subdivision (a) states that a GSA "may impose fees, including, but not limited to, permit fees and fees on groundwater extraction or other regulated activity, to fund the costs of a groundwater sustainability program …." Water Code section 15 states that " 'may' is permissive." Therefore, we conclude the authority granted to a GSA to impose fees is discretionary. The wording in Water Code section 10730 does not support the inference that this discretionary authority also is an exclusive responsibility. Furthermore, the County has cited no case addressing the issue of exclusive responsibility for imposing fees and no legislative history. Consequently, we conclude the County's responsibility to adopt mitigation measures in compliance with CEQA includes the authority to impose a fair-share fee. In other words, the Water Code did not take that authority away from counties and vest it entirely with GSA's. Therefore, like the Supreme Court in *Marina*, we conclude that if the County cannot adequately mitigate the project's contribution to declining groundwater levels, then

requiring permit applicants to pay a fair-share fee to the relevant GSA "may well represent a feasible mitigation." (*Marina*, *supra*, 39 Cal.4th at p. 367.)

The County argues that CEQA does not require the payment of fees to other agencies, such as GSA's, if such fees will not result in actual mitigation. It contends there is substantial evidence in the SREIR that the effectiveness, technological feasibility, and cost of implementing GSP's in the project area is uncertain and there is no substantial evidence that GSP's will result in any predictable amount of mitigation as they are adaptively managed over the coming decades. The problem with these arguments about substantial evidence is that they do not reference findings by the Board about the infeasibility of funding that the evidence supports. Section 21081 and Guidelines section 15091 require findings, with a brief explanation of the underlying rationale, and the absences of such findings and explanation are not rendered harmless by determinations in the SREIR's supported by substantial evidence.

Accordingly, we will remand the issue of mitigation in the form of a fair-share fee paid to the local GSA or to the County for further consideration along with findings and the explanation of those findings in accordance with Guidelines section 15091. The County's further consideration must take into account that Water Code section 10727.2, subdivision (d)(3) provides that a GSA shall include a component relating to the mitigation of the basin's overdraft and the implication of a finding by the Board of infeasibility—that is, it is infeasible for GSA's to fulfill their mitigation responsibility. Stated another way, if the Board makes an infeasibility finding on remand, that finding must be "for reasons other than those we have rejected." (*Marina*, *supra*, 39 Cal.4th at p. 369.)

The County suggests the imposition of a fair-share fee would be inappropriate because of the possibility that a GSA might also impose a fee and, as a result, the permit applicant would be required to pay twice. This possibility does not establish a fair-share fee is infeasible because the County's mitigation measure could be drafted to require

86.

payment of the fee only if the GSA had not adopted one. The County also asserts that a fee may become inappropriate in the future if produced water becomes acceptable for uses in agricultural and, as a result, the oil and gas industry become a net supplier of water. If that situation arises and the oil and gas activity authorized by the Revised Ordinance is no longer contributing to an adverse impact on water supplies, the County could amend the Revised Ordinance to eliminate the fee.

VI.    TEMBLOR LEGLESS LIZARD[*]

A.    Background

1.    2015 EIR

Section 4.4 of the July 2015 draft EIR addressed the project's impacts on biological resources and mitigation measures for those impacts. The biological resources included special status wildlife species,[22] three of which were the silvery legless lizard (*Anniella pulchra pulchra*), the Bakersfield legless lizard (*Annielle grinnelli*), and the Temblor legless lizard (*Anniella alexanderae*). Legless lizards can be mistaken for snakes because of their elongated body and absence of limbs. Unlike snakes, they have movable eyelids and lack external ear openings. From snout to vent, the species' length is 3.5 to 6.7 inches; with tail, their total length is around 8 inches.

The EIR explained that in September 2013, the *Anniella* species was split into five species, the four newly described species had not had their status determined, and the silvery legless lizard had been a California species of special concern. The EIR addressed the unresolved status of the newly described species by treating them as special

---

[*]    See footnote, *ante*, page 1.

[22]    The 2015 EIR defined special status wildlife species as those listed as threatened or endangered by the United States Fish and Wildlife Service (USFWS) or the California Department of Fish and Wildlife (CDFW); designated as a species of special concern by CDFW; fully protected under state law; or that meet the definition of rare or endangered under Guidelines section 15380, subdivisions (b) and (d).

status.  The EIR stated three species of legless lizards were expected to occur in the project area and discussed them together because information about the distribution of the new described species was limited.  The habitat for the legless lizards was described as "[b]urrows in sandy or loose loamy soil and leaf litter of high moisture content under sparse vegetation, particularly in coastal dune and oak woodland habitats."

The EIR stated the Temblor legless lizard was differentiated from the other species by its ventral coloring and was known from two sites in areas of sandy soil at the southeast base of the Temblor Range.  The two sites were separated by continuous habitat west of Highway 33.  Notwithstanding the two known sites, the EIR listed the Temblor legless lizard as a Category 2 species[23] and potential impacts were evaluated based on the potential occurrence in each project area tier and subarea.

Habitat suitability models were used to evaluate the project's potential impacts on legless lizards and other wildlife species.  The results from the models address the potential impacts *to habitat* for the various species.  The EIR stated that by modeling habitat impacts, the project's effects could be quantified without knowing the actual occurrence of a species at a particular place.  An advantage of this methodology is that habitat importance is based on relative quality instead of occupation levels, which fluctuate over time.  The modeling predicted annual levels of disturbance to 0.40 percent of the legless lizard's high quality habitat and 0.25 percent of its poor to moderate quality habitat.  The EIR also estimated 25-year impacts to 9.9 percent of the legless lizard's high quality habitat and 6.2 percent to its poor to moderate quality habitat.  The EIR concluded:  "These impacts would be significant without mitigation."  More generally,

---

**23**     The 2015 EIR defines a Category 2 species as one "known or likely to occur in the Project Area for which modeling data was not available to quantify and analyze potential Project impacts."  In comparison, a Category 1 species (like the silvery legless lizard) is one "for which one of four types of habitat suitability modeling data was available and used to quantify and analyze potential Project impacts."

the EIR concluded "potential impacts to special status plants and wildlife would be significant without mitigation."

The draft EIR set forth 20 mitigation measures for impacts to biological resources. MM 4.4-1 required special status wildlife surveys to be completed by a qualified biologist within 30 days before new ground disturbing construction activity began. MM 4.4-3 provided for the use of exclusion barriers or buffers where they were deemed feasible by the qualified biologist. MM 4.4-14 required the development and implementation of a worker environmental awareness program for all personnel that could access a site prior to commencing disturbance activities. Personnel were required to sign a statement verifying completion of the awareness program and the permit applicants were required to keep training records for at least five years. The EIR concluded that, after mitigation, the impacts to special status species would be less than significant.

### 2. *Comment to Draft SREIR and the County's Response*

Sierra Club's September 2020 comment letter to the draft SREIR (1) stated the 2015 EIR did not fully evaluate impacts to the Bakersfield and Temblor legless lizards because the EIR claimed habitat modeling was unavailable and (2) asserted a recent study added new information about the species that allowed for habitat modeling. The study cited was commissioned by the California Department of Fish and Wildlife. (Parham, et al, *Conservation Assessment of the California Legless Lizard* (Aug. 16, 2019) (2019 Parham Study).) The comment letter asserted the Temblor legless lizard "may be at particular risk due to its limited habitat, and the fact that the vast majority of its habitat is privately owned land." The comment letter stated the draft SREIR must be updated to evaluate the potential harms to each species of legless lizard separately and to consider feasible mitigation measures, such as avoidance of legless lizard habitat.

89.

County's response No. 0009-112 noted the comment had cited the 2019 Parham Study and had asserted the study provided new information about the newly identified species of legless lizards and provided modeling for their habitat. The response rejected the comment's claim that the SREIR must be updated to provide an additional discussion of the legless lizards. First, the response stated the defects that the 2020 opinion required to be corrected did not include any issues involving legless lizards. Second, the response concluded the comment did "not raise either substantial changes in circumstances or new information requiring supplemental analysis under CEQA."

The response summarized the 2015 EIR's approach to stating it (1) found the silvery, Bakersfield and Temblor legless lizards had the potential to occur within the project area; (2) little was known about the Bakersfield and Temblor legless lizards and they were conservatively assumed to be species of special status like the silvery legless lizard; (3) potential impacts to the three species were evaluated based on their potential occurrence in each tier and subarea of the project area; and (4) all three species were discussed together due to the limited distribution information available.

The response acknowledged the 2019 Parham Study had expanded the ranges of the Temblor legless lizard and two other new species and noted the study did not indicate that habitat for any species within Kern County was outside the subareas or tiers identified in the 2015 EIR. The response disagreed with the comment's assertion that some species of legless lizards may be disproportionately harmed due to the proximity of their habitat to oil and gas activity. The response concluded that, "[g]iven the limited information and need for further study identified in [the 2019 Parham Study], it remains appropriate to treat the legless lizard species together.

The response also described the conservative assumption made in the 2015 EIR's analysis of the three species of legless lizards. It noted the Bakersfield and Temblor legless lizards were classified as Category 2 species—that is, species " 'known or likely to occur in the Project Area for which modeling data is not available to quantify and

90.

analyses potential Project impacts.' " Potential impacts on Category 2 (i.e., nonmodeled) species such as the Temblor legless lizard were conservatively assumed to occur "even in areas where there is an extremely low likelihood of species impact."

With respect to the mitigation measures, the response stated MM 4.4-3 has been clarified to state that the 30-foot buffer zone applied to all legless lizard species. The earlier version had referred to the silvery legless lizard. The response also described other mitigation measures that would benefit all legless lizards in the project area.

B.      Legal Principles Governing Additional CEQA Review

Sierra Club contends the County did not revise the SREIR's discussion of impacts to the Temblor legless lizard and, as a result, violated CEQA's requirements for subsequent or supplemental review contained in section 21166 and Guidelines section 15162, subdivision (a). In response, the County contends it complied with CEQA because the requirement for additional environmental review does not apply to the facts of this case. Based on the way the parties have framed their arguments, we assume for purposes of this appeal that the question presented is properly framed as whether the County erred when it determined section 21166 and Guidelines section 15162, subdivision (a) did not require a more extensive environmental review of the impacts to the Temblor legless lizard.[24]

Section 21166 provides in part:

"When an environmental impact report has been prepared for a project pursuant to [CEQA], no subsequent or supplemental environmental impact report shall be required by the lead agency … unless one or more of the

---

[24]     We note, however, that this case is not the typical situation where new information is learned by the lead agency after it has "certif[ied] the completion of" an EIR (§ 21100, subd. (a)) *and* that certification is in effect when the claim for additional review is presented to the lead agency. Here, the Board's certification of the 2015 EIR was vacated before the 2019 Parham Study was presented to the County. Also, that new information was discussed in the SREIR and made available to the Board *before* it certified the SREIR as complete.

following events occurs: [¶] … [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

Guidelines section 15162 explains when changes or new information trigger the need for additional environmental review by stating in part:

"(a) When an EIR has been certified …, no subsequent EIR shall be prepared for that project unless the lead agency determines, on the basis of substantial evidence in the light of the whole record, one or more of the following: [¶] …[¶]

"(2) Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR … due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

"(3) New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

"(A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

"(B) Significant effects previously examined will be substantially more severe than shown in the previous EIR."

For practical purposes, the foregoing provisions create "a presumption against further environmental review after a project has been previously subjected to environmental review." (*Save Our Heritage Organisation v. City of San Diego* (2018) 28 Cal.App.5th 656, 666.) "[S]ection 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired [citation], and the question is whether circumstances have changed enough to justify repeating a substantial portion of the process." (*Id*. at pp. 666–667.)

The County's determination that, for purposes of section 21166, there was no new information of substantial importance and no substantial change in circumstances is reviewed for substantial evidence. (*Citizens' Committee to Complete the Refuge v. City*

*of Newark* (2021) 74 Cal.App.5th 460, 470.)  Sierra Club, as the party challenging the County's determination, has the burden of demonstrating that the County's decision is not supported by substantial evidence and, therefore, violates CEQA.  (*Ibid*.)  In applying the substantial evidence standard, our task is not to weigh conflicting evidence and determine who has the better argument.  (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935.)

Another principle of judicial review applicable to this appeal is that our review for substantial evidence is limited to the administrative record.  Stated another way, we decide "only whether the administrative record as a whole demonstrates substantial evidence to support the determination that the changes in the project or its circumstances were not so substantial as to require major modifications of the EIR." (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1318.)  Guidelines section 15162, subdivision (a) refers to "substantial evidence in the light of the whole record" and this reference to the whole record means the administrative record before the lead agency when it made the decision that additional environmental review was not required. Accordingly, to the extent that the amicus curiae brief addressing the Temblor legless lizard refers to documents outside the administrative record, we have not considered those documents.

C.    Application of the Substantial Evidence Standard

Our analysis of whether new information or changed circumstances requires additional environmental review begins by identifying the new information relied upon by Sierra Club.  Most of that information is contained in the 2019 Parham Study and the October 2020 petition to list the Temblor legless lizard as a threatened or endangered species under the federal Endangered Species Act (ESA; 16 U.S.C. § 1531 et seq.).  Both of these documents are part of the administrative record.  The claim of changed

circumstances overlaps with the new information because the changed circumstances are described by the new information about the Temblor legless lizard's range and rarity.

### 1. 2019 Parham Study

The 2019 Parham Study was generated to report the results of a four-year project whose main objective was to establish species range boundaries and evolutionary lineages for the newly described species of legless lizards. The project consisted of surveys and genetic and ecological analyses addressing the distribution of legless lizards and testing the validity of the newly described species. The field surveys were focused on new sites between the samples or known ranges described in a 2013 study. The project resulted in specimens for six species of legless lizards being collected from new localities and, thus, new range estimates were made for those six species.

Appendix B to the 2019 Parham Study listed the survey sites checked for the presence of legless lizards and the collections, if any, from the site. Kern County contained 32 of the survey sites and seven of those sites resulted in 13 collections. Table 2 reported that for all the sites included in the study, 27 specimens of Temblor legless lizards were obtained from seven unique locations.

The 2019 Parham Study stated: "The most significant range extension involved [the Temblor legless lizard], which was previously known from one area east of the Temblor Mountains. We have extended its range as far north as Coalinga." It also stated that most specimens of the Temblor legless lizard were found in alkali desert scrub or annual grasslands. The total range of the Temblor legless lizard was estimated at 1,719.54 square kilometers (approximately 664 square miles) with only about 5.5 percent of this land being federal land or protected by the CDFW. The 2019 Parham Study describes the range as "narrow" and stated the predictive range maps generated by Ecological Niche Modeling had overpredicted the Temblor legless lizard range into areas that had been developed, which "may indicate potential extirpation from recent human

94.

development." In other words, development might or might not be the reason Temblor legless lizards were not found further east in the San Joaquin Valley. The study stated the occurrence of Temblor legless lizards further west into the Coast Range could be tested with further sampling, but all known samples from that area were confirmed to be silvery legless lizards.

The 2019 Parham Study concluded with seven recommendations. The third recommendation stated that more protection for the Temblor legless lizard may be warranted and suggested applying for federal or state listing. It also stated the discovery of new sites for the Temblor legless lizard "provide additional hope for its conservation, but currently all but one known site for this species is on private land." The sixth recommendation stated:

> "Additional field surveys for *Anniella* are needed to discover new sites and samples for each species. Given the potentially imperiled status of [the Temblor legless lizard], identifying additional sites for this species should be a top priority. In the Coast Ranges Transverse Ranges and Southern Sierra Nevada, there are also areas where it is unclear what species may occur. By further sampling these areas we can identify areas of sympatry, better understand their geographic ranges, and better understand the factors that shape their distribution. With this information we can make more informed statements about their conservation status."

### 2. *Conflicting Inferences*

The parties have presented different views of the information in the 2019 Parham Study. The County takes the view that the information was far from complete, yet provided good news that the range of the Temblor legless lizard was more extensive than shown in the 2013 study. In contrast, Sierra Club and an amicus curiae believe the new information shows the impact on the Temblor legless lizard will be more severe than described in the 2015 EIR.

In our view, the different views of the 2019 Parham Study are the result of the parties drawing different inferences from the information provided. Our analysis of these

different views is governed by the principle of law stating how a reviewing court applies the deferential substantial evidence standard to the parties' conflicting inferences.  In an earlier CEQA case involving the County, we described that principle of law by stating:

> "We recognize conflicting inferences could be drawn from the evidence presented, but the substantial evidence standard only requires sufficient evidence from which any reasonable trier of fact could find the fact in question.  (See *California Native Plant Society v. City of Rancho Cordova*[, *supra,*] (2009) 172 Cal.App.4th 603, 639 [under substantial evidence standard, plaintiffs have burden of showing lead agency could not have reasonably made the factual determination challenged].)"  (*Association of Irritated Residents v. Kern County Bd. of Supervisors* (2017) 17 Cal.App.5th 708, 745.)

The principle that a court of review must accept reasonable inferences drawn by the lead agency in a CEQA case is consistent with how the substantial evidence standard of review is applied to trial court decisions.  In that context, "[t]he trier of fact is the sole arbiter of all conflicts in the evidence, conflicting interpretations thereof, and conflicting inferences which reasonably may be drawn therefrom."  (*Horn v. Oh* (1983) 147 Cal.App.3d 1094, 1099.)

We note that the appellate briefing of Sierra Club and the amicus curiae have not acknowledged the principle about conflicting inferences.  Although the County's briefing does not address conflicting inferences, it quotes the definition of substantial evidence that mentions "reasonable inferences."  (Guidelines, § 15384, subd. (a).)

Applying the principle about conflicting inferences to the facts of this case, we conclude the County did not draw an unreasonable inference when it determined that the information about the expanded range of the Temblor legless lizard was positive news and, thus, did not warrant inferring the impacts on the Temblor legless lizard would be more severe than the significant impact (without mitigation) identified in the 2015 EIR.  Also, the statements in the 2019 Parham Study's recommendation for additional surveys and the study's many uses of the word "may" support the County's inference that the new

information is not definitive.  Consequently, under the deferential substantial evidence standard, we uphold the County's determination that there was no new information of substantial importance and no substantial change in circumstances warranting additional environmental review.  (§ 21166; Guidelines, § 15162, subd. (a).)

Besides failing to address the principle about conflicting inferences, Sierra Club's arguments are unconvincing because they are based on a misinterpretation of the 2015 EIR.  For example, Sierra Club asserts:  "The 2015 EIR told the public and decisionmakers that the Temblor legless lizard was present throughout nearly all of Kern County, with only a small percentage of its habitat affected by the Ordinance.  (AR1122-23, 1231.)"  This assertion is objectively unreasonable because the 2015 EIR states:  "The Temblor legless lizard is known from two sites separated by continuous habitat west of Highway 33.  The known sites are in areas of sandy soil at the southeast base of the Temblor Range between McKittrick and Taft on the west side of the southern San Joaquin Valley in Kern County, California."  These sentences do not tell the reader that the Temblor legless lizard is present throughout nearly all of Kern County.  Thus, part of Sierra Club's argument about the 2019 Parham Study containing significant new information is based on a mischaracterization of the old information presented in the 2015 EIR.

VII.   SPANISH TRANSLATION[*]

A.   <u>Background</u>

Sierra Club's May 29, 2020 letter to the County asserted the County must make its CEQA process accessible to the many Spanish language speakers in Kern County. Similarly, Sierra Club's September 2020 comment letter to the draft SREIR stated the County must disclose information about the Revised Ordinance and its environmental impacts in Spanish to ensure meaningful involvement of Spanish speaking residents who

---

[*]      See footnote, *ante*, page 1.

are disproportionately harmed by oil and gas activities. The letter asserted that at the August 2020 workshop, the County did not disclose any environmental information but merely described the draft SREIR's structure and the decision making schedule. It also stated the County prohibited the public from offering oral comments at the May 2020 and August 2020 virtual workshops.

The County's response No. 0009-8 noted that CEQA and the Guidelines do not require translation and, even so, Spanish translation services were provided at the May 13, 2020 virtual scoping meeting and the two virtual public workshops held in August and November of 2020 during the COVID-19 pandemic. The response also stated that, at the workshops, live translation services and closed captioning in Spanish were provided to facilitate participation and understanding of the SREIR. The County's response No. 0007-2 stated the Spanish language translation through closed captioning and live simultaneous interpretation via conference call for the scoping meeting and workshops provided "access opportunities beyond what is required by law to ensure that the County's Spanish-speaking residents could participate" and the presentations given emphasized that written comments could be submitted in any language. Both responses addressed the upcoming public hearings before the planning commission and the Board, with response No. 0009-8 stating "Spanish translation services will be available for the presentation, as well as for Spanish-speakers who request to provide public comment."

The Board's March 2021 written findings described (1) the closed captioning and live stream Spanish translation used at the May 2020 virtual scoping meeting; (2) the August 2020 release of the draft SREIR, (3) the August 2020 virtual public workshop where closed captioning and translations services were provided, (4) the second circulation of the draft SREIR, which incorporated public and agency comments, (5) the subsequent November 2020 virtual public workshop where closed captioning and translations services were provided, and (6) the January 2021 release of responses to all written comments, which preceded the Board's public hearing.

98.

B.      Contentions

On appeal, Sierra Club contends the County's refusal to translate notices or any portion of the SREIR into Spanish constitutes an abuse of discretion because it was not supported by substantial evidence and it undermined CEQA's purposes of informing the public and promoting public participation.  In particular, Sierra Club contends the limited accommodations did not provide Spanish-speaking residents who attended a meeting with access to the information disclosed in the SREIR because (1) the PowerPoint slides presented at two workshops were in English and did not identify specific impacts or project alternatives and (2) workshop attendees were directed to read for themselves substantive information in the SREIR, which was available only in English.

In response, the County contends substantial evidence supports its decision not to translate portions of the SREIR into Spanish.  In addition, the County contends Sierra Club's argument is procedurally barred by res judicata and law of the case from raising the issue.

C.      Res Judicata

" 'Res judicata' describes the preclusive effect of a final judgment on the merits.  Res judicata, or claim preclusion, prevents relitigation of the same cause of action in a second suit between the same parties or parties in privity with them."  (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896.)  The elements of the doctrine of res judicata are: " '(1) A claim or issue raised in the present action is identical to a claim or issue litigated in a prior proceeding; (2) the prior proceeding resulted in a final judgment on the merits; and (3) the party against whom the doctrine is being asserted was a party or in privity with a party to the prior proceeding.' "  (*People v. Barragan* (2004) 32 Cal.4th 236, 253.)

The doctrine of res judicata does not prevent Sierra Club from arguing notices relating to the SREIR and portions of the SREIR should have been translated into Spanish.  While the third element (i.e., same parties) is satisfied, the first element is not.

99.

When our February 2020 opinion was issued, the SREIR and related notices that are the subject of Sierra Club's argument did not exist. Because the documents are different from those addressed previously, the issue of translation raised in this appeal is not "*identical* to a claim or issue litigated in a prior proceeding." (*People v. Barragan*, *supra*, 32 Cal.4th at p. 253, italics added.) Therefore, res judicata's primary aspect (i.e., claim preclusion) and secondary aspect (i.e., issue preclusion or collateral estoppel) do not apply to the arguments raised in this appeal. (See *DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 823–824 [two aspects of res judicata]; see generally, Heiser, *California's Confusing Collateral Estoppel (Issue Preclusion ) Doctrine* (1998) 35 San Diego L.Rev. 509, fn. 1.)

D.      Law of the Case

California's law of the case doctrine provides that when an appellate court decides an appeal and " 'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal ....' " (*Kowis v. Howard* (1992) 3 Cal.4th 888, 892–893.)

In *King & Gardiner*, *supra*, 45 Cal.App.5th 814, an unpublished portion of the opinion concluded that "Sierra Club has not established the County abused its discretion when it chose not to provide interpreters and chose not to translate notices or parts of the EIR into Spanish. (§ 21168.5.) Accordingly, Sierra Club has not demonstrated prejudicial error." In reaching this conclusion, the opinion stated the following principles or rules of law.

First, the California Constitution does not require or prohibit public agencies from translating CEQA documents into other languages such as Spanish. (See Cal. Const., art. III, § 6, subds. (b), (c).) Second, CEQA and the Guidelines do not require or prohibit public agencies from translating CEQA documents into other languages or providing

100.

translators during CEQA workshops, public meetings, or other administrative proceedings. Third, the question of whether to provide interpreters and translations of CEQA documents is committed to the public agency's discretion and that discretionary authority is derived from CEQA's purposes of (1) informing the public of the potentially significant environmental effects of proposed activities and (2) promoting public participation in the environmental review process.[25] We also concluded that in exercising this discretion, an agency must evaluate the facts and circumstances of the case and the factual basis for the agency's decision is reviewed under the substantial evidence standard. The foregoing principles (i.e., rules of law) must be applied in this appeal to comply with the law of the case doctrine.

To explain the scope of the foregoing principles, we note that nothing in our 2020 opinion stated or implied that a lead agency's decisions about providing translations and interpreters was committed to the agency's *absolute* discretion and, thus, was beyond judicial review. (Cf. *Heckler v. Chaney* (1985) 470 U.S. 821, 831 ["agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion"; such decisions unsuitable for judicial review].) Instead, our analysis demonstrated that the County's decisions regarding translations and interpreters were subject to judicial review, which necessarily implies it is possible for situations to arise where a failure to translate documents or provide interpreters constitutes an abuse of discretion.

Based on the first two principles identified above, we conclude the County's decision not to translate notices or portions of the SREIR did not violate a constitutional, statutory, or regulatory rule of law mandating a translation when specified criteria are met, such as a timely request. No such rule of law exists. Instead, the County's decision

---

[25] We note that the conclusion that translation is committed to an agency's discretion necessarily implies that there are situations where a failure to translate constitutes an abuse of that discretion.

not to translate documents involves an exercise of discretionary authority that is subject to judicial review under the abuse of discretion standard.

Applying the abuse of discretion standard to the County's decision includes reviewing the County's underlying findings for fact, either expressed or implied, under the substantial evidence standard. (See *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711 ["abuse of discretion standard is not a unified standard"].) The 2020 opinion implied that the process an agency undertakes involves (1) considering the totality of the circumstances, (2) making findings of fact, and (3) then weighing those facts in light of CEQA's purposes to reach a decision how to exercise the discretionary authority. This last step, unlike finding facts or making conclusions of law, is truly a matter of discretion, and results in error "only if arbitrary and capricious." (*Id*. at p. 712.) Another way of stating the arbitrary and capricious test is that the decision "exceeded the bounds of reason, all of the circumstances … being considered." (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598 [abuse of discretion standard]; see *Safeco Ins. Co. of America v. Superior Court* (2009) 173 Cal.App.4th 814, 832 [decision exceeds the bounds of reason].)

### E. The County Evaluated the Evidence

Sierra Club asserts that roughly one in six residents of Kern County speaks Spanish with limited or no English proficiency and the County made its decision not to translate documents without evaluating these facts and circumstances. It is relatively easy for an appellant to contend an agency or a superior court *failed to consider or evaluate* certain evidence or factors. However, it is difficult for an appellant to actually demonstrate the mental process used by an agency's decision makers or a judge omitted or ignored evidence. (See *Gonzales v. Interinsurance Exchange* (1978) 84 Cal.App.3d 58, 63 [" 'consider' " refers to the mental process of weighing of evidence].)

Here, we assume without deciding that a lead agency, after receiving a timely request to translate CEQA documents, abuses its discretion when it decides the request without considering the relevant evidence. This assumption is based on case law concluding a trial court abuses its discretion by failing to consider relevant evidence. (*Ritchie v. Konrad* (2004) 115 Cal.App.4th 1275, 1282; *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 304 ["court does not have discretion to ignore any relevant circumstance enumerated in the statute"].)

Based on the administrative record, we reject the contention that, when the County refused to translate certain CEQA documents into Spanish, it failed to consider or evaluate evidence about the population, demographics and poverty levels within Kern County generally or within the project area in particular. The County's response No. 0010-3 notes that the SREIR "includes updated demographic and poverty level census tract data in the projected locations of future oil and gas activities permitted under the Project." The response discusses the percent of population identified as white and Hispanic in Tier 1 areas (where oil and gas activity is the primary land use) and non-Tier 1 areas. It states that a vast majority of the wells likely to be drilled under the Revised Ordinance will be located in Tier 1 areas, which has a higher proportion of white residents and lower poverty rate than non-Tier 1 lands and Kern County as a whole. Thus, the SREIR rejected the assertion that oil and gas activities authorized by the project would disproportionately focus potential environmental impacts on Hispanic or low income populations.

The information and analysis in the final SREIR, including the County's response No. 0010-3, and the explicit statements about Spanish translations for the scoping meeting, workshops, and public hearings in the Board's findings demonstrates the County did evaluate the facts and circumstances relevant to Sierra Club's request for translation of notices and portions of the SREIR. Consequently, we reject Sierra Club's claim to the contrary.

Also, to the extent that Sierra Club contends the County abused its discretion by refusing to acknowledge or recognize it had the discretionary authority described in our prior opinion, we reject this contention. The fact that the County granted the request in part by providing translations and closed captioning at the virtual scoping meeting and workshops shows the County exercised its discretion and, thus, supports the inference that the County was aware of its discretionary authority.

F.      No Abuse of Discretion

The evidence in the administrative record relating to the translation of the notices and portions of the SREIR does not point to a single outcome. Some evidence supports translating the documents to further CEQA's purposes of informing the public and promoting public participation and other evidence supports the County's decision not to translate the notices and portions of the SREIR. When applying the substantial evidence standard to an agency's findings, a reviewing court must not reweigh conflicting evidence. (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 816.) Applying this rule of appellate procedure, we will not reweigh the evidence. Instead, we conclude that implied findings of fact derived from that conflicting evidence are sufficient to establish that the County's decision was not arbitrary and capricious— that is, was not beyond the bounds of reason—and, thus, was not an abuse of discretion.

A more detailed account of the conflicting evidence is not provided here because, contrary to the applicable rules of appellate practice, Sierra Club's challenge to the sufficiency of the evidence lacked the requisite summary of the evidence on point, favorable and unfavorable. (See *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738.) Without such a summary, the challenge may be deemed waived, which is another way of saying the appellant failed to carry its burden of affirmatively demonstrating error. (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887 [appellant "cite[d] only evidence favorable to his position, ignoring all to the contrary. Such briefing

is manifestly deficient."].)  Accordingly, we do not reach the question of whether Sierra Club demonstrated prejudice from the asserted abuse of discretion.  (See § 21005, subd. (b) ["there is no presumption that error is prejudicial"].)

## VIII.   APPELLATE RELIEF[*]

As in the prior appeal, we conclude the " 'usual remedy of setting aside a project approval' " is appropriate.  (*King & Gardiner*, *supra*, 45 Cal.App.5th at p. 896.)  We have considered the County's arguments for a limited remedy that allows the project approvals to remain in place while the SREIR is brought into compliance with CEQA. (See § 21168.9.)  A suspension limited to noncompliant project activities is allowed "only if a court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice complete and full compliance with [CEQA], and (3) the court has not found the remainder of the project to be in noncompliance with [CEQA]."  (§ 21168.9, subd. (b).)  Here, the CEQA violations relating to the assessment of health risks and impacts on water supply are relatively far reaching and also taint the adoption of the statement of overriding considerations.  (See *Marina, supra,* 39 Cal.4th at p. 368 [court invalidated the statement of overriding considerations].)  Therefore, in the circumstances presented, we cannot find the affected project activities are severable *and* severance will not prejudice full compliance with CEQA.  Accordingly, we will direct the superior court to issue a writ of mandate that implements the usual remedy.

## DISPOSITION

The second modified judgment entered on October 4, 2022, is reversed in part and affirmed in part and the order discharging the third writ filed on November 2, 2022 is reversed.  The part of the second modified judgment and the third writ directing the respondents to suspend operation of Kern County Ordinance No. G-8992 and to refrain from reviewing and approving permits pursuant to that ordinance, or a modified form of

---

[*]       See footnote, *ante*, page 1.

that ordinance, shall remain in effect pending the superior court's issuance of a modified judgment and fourth peremptory writ of mandate continuing the suspension. That suspension shall remain in effect until the superior court discharges the fourth writ.

On remand, the superior court is directed to enter a modified judgment and a fourth peremptory writ of mandate for corrective action that are not inconsistent with this opinion. The modified judgment and fourth peremptory writ of mandate shall direct the Board to (1) set aside its certification of the final SREIR and August 2022 addendum as complete, (2) set aside its adoption of the revised and restated findings of fact and the restated statement of overriding considerations, and (3) set aside the approval of the Revised Ordinance. The writ of mandate also shall direct the County not to present an ordinance streamlining the permitting of oil and gas activities to the Board for approval until the County has (4) prepared a revised environmental impact report that corrects the CEQA violations relating to (a) the rejection of agricultural conservation easements as a form of partial mitigation for the conversion of agricultural land, (b) the assessment of cancer risks associated with the drilling of multiple wells near sensitive receptors, and (c) the analysis of water supply impacts; (5) circulated the revised environmental impact report for public review and comment; and (6) prepared and published responses to the comments received before certifying the revised environmental impact report as complete and approving such an ordinance.

Appellants shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278.)


FRANSON, Acting P. J.

WE CONCUR:


PEÑA, J.


SNAUFFER, J.

106.